# MISSOURI ET AL. *v.* JENKINS, BY HER FRIEND, AGYEI, ET AL.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 88–64.   Argued February 21, 1989—Decided June 19, 1989

*Bruce Farmer*, Assistant Attorney General of Missouri, argued the cause for petitioners. With him on the brief were *William L. Webster*, Attorney General, *Terry Allen*, Deputy Attorney General, and *Michael L. Boicourt* and *Bart A. Matanic*, Assistant Attorneys General.

*Jay Topkis* argued the cause for respondents. With him on the brief were *Julius LeVonne Chambers, Charles Stephen Ralston, Arthur A. Benson II, Russell E. Lovell II,* and *Theodore M. Shaw.**

JUSTICE BRENNAN delivered the opinion of the Court.

This is the attorney's fee aftermath of major school desegregation litigation in Kansas City, Missouri. We granted certiorari, 488 U. S. 888 (1988), to resolve two questions relating to fees litigation under 90 Stat. 2641, as amended, 42 U. S. C. § 1988. First, does the Eleventh Amendment prohibit enhancement of a fee award against a State to compensate for delay in payment? Second, should the fee award compensate the work of paralegals and law clerks by applying the market rate for their work?

---

*John A. DeVault III* filed a brief for the National Association of Legal Assistants, Inc., as *amicus curiae* urging affirmance.

## I

This litigation began in 1977 as a suit by the Kansas City Missouri School District (KCMSD), the school board, and the children of two school board members, against the State of Missouri and other defendants. The plaintiffs alleged that the State, surrounding school districts, and various federal agencies had caused and perpetuated a system of racial segregation in the schools of the Kansas City metropolitan area. They sought various desegregation remedies. KCMSD was subsequently realigned as a nominal defendant, and a class of present and future KCMSD students was certified as plaintiffs. After lengthy proceedings, including a trial that lasted 7½ months during 1983 and 1984, the District Court found the State of Missouri and KCMSD liable, while dismissing the suburban school districts and the federal defendants. It ordered various intradistrict remedies, to be paid for by the State and KCMSD, including $260 million in capital improvements and a magnet-school plan costing over $200 million. See *Jenkins* v. *Missouri*, 807 F. 2d 657 (CA8 1986) (en banc), cert. denied, 484 U. S. 816 (1987); *Jenkins* v. *Missouri*, 855 F. 2d 1295 (CA8 1988), cert. granted, 490 U. S. 1034 (1989).

The plaintiff class has been represented, since 1979, by Kansas City lawyer Arthur Benson and, since 1982, by the NAACP Legal Defense and Educational Fund, Inc. (LDF). Benson and the LDF requested attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988.[1] Benson and his associates had devoted 10,875 attorney hours to the litigation, as well as 8,108 hours of paralegal and law clerk time. For the LDF the corresponding

---

[1] Section 1988 provides in relevant part: "In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U. S. C. § 1681 *et seq.*], or title VI of the Civil Rights Act of 1964 [42 U. S. C. § 2000d *et seq.*], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

figures were 10,854 hours for attorneys and 15,517 hours for paralegals and law clerks. Their fee applications deleted from these totals 3,628 attorney hours and 7,046 paralegal hours allocable to unsuccessful claims against the suburban school districts. With additions for postjudgment monitoring and for preparation of the fee application, the District Court awarded Benson a total of approximately $1.7 million and the LDF $2.3 million. App. to Pet. for Cert. A22–A43.

In calculating the hourly rate for Benson's fees the court noted that the market rate in Kansas City for attorneys of Benson's qualifications was in the range of $125 to $175 per hour, and found that "Mr. Benson's rate would fall at the higher end of this range based upon his expertise in the area of civil rights." *Id.*, at A26. It calculated his fees on the basis of an even higher hourly rate of $200, however, because of three additional factors: the preclusion of other employment, the undesirability of the case, and the delay in payment for Benson's services. *Id.*, at A26–A27. The court also took account of the delay in payment in setting the rates for several of Benson's associates by using current market rates rather than those applicable at the time the services were rendered. *Id.*, at A28–A30. For the same reason, it calculated the fees for the LDF attorneys at current market rates. *Id.*, at A33.

Both Benson and the LDF employed numerous paralegals, law clerks (generally law students working part time), and recent law graduates in this litigation. The court awarded fees for their work based on Kansas City market rates for those categories. As in the case of the attorneys, it used current rather than historic market rates in order to compensate for the delay in payment. It therefore awarded fees based on hourly rates of $35 for law clerks, $40 for paralegals, and $50 for recent law graduates. *Id.*, at A29–A31, A34. The Court of Appeals affirmed in all respects. 838 F. 2d 260 (CA8 1988).

## II

Our grant of certiorari extends to two issues raised by the State of Missouri. Missouri first contends that a State cannot, consistent with the principle of sovereign immunity this Court has found embodied in the Eleventh Amendment, be compelled to pay an attorney's fee enhanced to compensate for delay in payment. This question requires us to examine the intersection of two of our precedents, *Hutto* v. *Finney*, 437 U. S. 678 (1978), and *Library of Congress* v. *Shaw*, 478 U. S. 310 (1986).[2]

In *Hutto* v. *Finney*, the lower courts had awarded attorney's fees against the State of Arkansas, in part pursuant to § 1988, in connection with litigation over the conditions of confinement in that State's prisons. The State contended that any such award was subject to the Eleventh Amendment's constraints on actions for damages payable from a State's treasury. We relied, in rejecting that contention, on the distinction drawn in our earlier cases between "retroactive monetary relief" and "prospective injunctive relief." See *Edelman* v. *Jordan*, 415 U. S. 651 (1974); *Ex parte Young*, 209 U. S. 123 (1908). Attorney's fees, we held, belonged to the latter category, because they constituted reimbursement of "expenses incurred in litigation seeking only prospective relief," rather than "retroactive liability for prelitigation conduct." *Hutto*, 437 U. S., at 695; see also *id.*, at 690. We explained: "Unlike ordinary 'retroactive' relief such as damages or restitution, an award of costs does not compensate the plaintiff for the injury that first brought him into court. Instead, the award reimburses him for a portion of the expenses he incurred in seeking prospective relief." *Id.*, at 695, n. 24. Section 1988, we noted, fit easily into the

---

[2] The holding of the Court of Appeals on this point, 838 F. 2d, at 265–266, is in conflict with the resolution of the same question in *Rogers* v. *Okin*, 821 F. 2d 22, 26–28 (CA1 1987), cert. denied *sub nom. Commissioner, Massachusetts Dept. of Mental Health* v. *Rogers*, 484 U. S. 1010 (1988).

longstanding practice of awarding "costs" against States, for the statute imposed the award of attorney's fees "as part of the costs." *Id.*, at 695–696, citing *Fairmont Creamery Co.* v. *Minnesota,* 275 U. S. 70 (1927).

After *Hutto,* therefore, it must be accepted as settled that an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment. And if the principle of making such an award is beyond the reach of the Eleventh Amendment, the same must also be true for the question of how a "reasonable attorney's fee" is to be calculated. See *Hutto, supra,* at 696–697.

Missouri contends, however, that the principle enunciated in *Hutto* has been undermined by subsequent decisions of this Court that require Congress to "express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 243 (1985); *Welch* v. *Texas Dept. of Highways and Public Transportation,* 483 U. S. 468 (1987). See also *Dellmuth* v. *Muth, ante,* p. 223; *Pennsylvania* v. *Union Gas Co., ante,* p. 1. The flaw in this argument lies in its misreading of the holding of *Hutto.* It is true that in *Hutto* we noted that Congress could, in the exercise of its enforcement power under § 5 of the Fourteenth Amendment, set aside the States' immunity from retroactive damages, 437 U. S., at 693, citing *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976), and that Congress intended to do so in enacting § 1988, 437 U. S., at 693–694. But we also made clear that the application of § 1988 to the States did not depend on congressional abrogation of the States' immunity. We did so in rejecting precisely the "clear statement" argument that Missouri now suggests has undermined *Hutto.* Arkansas had argued that § 1988 did not plainly abrogate the States' immunity; citing *Employees* v. *Missouri Dept. of Public Health and Welfare,* 411 U. S. 279 (1973), and *Edelman* v. *Jordan, supra,* the State contended that "retroactive liability" could not be imposed on the States "in the absence of an extraordinarily ex-

plicit statutory mandate." *Hutto,* 437 U. S., at 695. We responded as follows: "[T]hese cases *[Employees* and *Edelman]* concern retroactive liability for prelitigation conduct rather than expenses incurred in litigation seeking only prospective relief. The Act imposes attorney's fees 'as part of the costs.' Costs have traditionally been awarded without regard for the States' Eleventh Amendment immunity." *Ibid.*

The holding of *Hutto,* therefore, was not just that Congress had spoken sufficiently clearly to overcome Eleventh Amendment immunity in enacting § 1988, but rather that the Eleventh Amendment did not apply to an award of attorney's fees ancillary to a grant of prospective relief. See *Maine* v. *Thiboutot,* 448 U. S. 1, 9, n. 7 (1980). That holding is unaffected by our subsequent jurisprudence concerning the degree of clarity with which Congress must speak in order to override Eleventh Amendment immunity, and we reaffirm it today.

Missouri's other line of argument is based on our decision in *Library of Congress* v. *Shaw, supra. Shaw* involved an application of the longstanding "no-interest rule," under which interest cannot be awarded against the United States unless it has expressly waived its sovereign immunity. We held that while Congress, in making the Federal Government a potential defendant under Title VII of the Civil Rights Act of 1964, had waived the United States' immunity from suit and from costs including reasonable attorney's fees, it had not waived the Federal Government's traditional immunity from any award of interest. We thus held impermissible a 30 percent increase in the "lodestar" fee to compensate for delay in payment. Because we refused to find in the language of Title VII a waiver of the United States' immunity from interest, Missouri argues, we should likewise conclude that § 1988 is not sufficiently explicit to constitute an abrogation of the States' immunity under the Eleventh Amendment in regard to any award of interest.

The answer to this contention is already clear from what we have said about *Hutto* v. *Finney*. Since, as we held in *Hutto*, the Eleventh Amendment does not bar an award of attorney's fees ancillary to a grant of prospective relief, our holding in *Shaw* has no application, even by analogy.[3] There is no need in this case to determine whether Congress has spoken sufficiently clearly to meet a "clear statement" requirement, and it is therefore irrelevant whether the Eleventh Amendment standard should be, as Missouri contends, as stringent as the one we applied for purposes of the no-interest rule in *Shaw*. Rather, the issue here—whether the "reasonable attorney's fee" provided for in § 1988 should be calculated in such a manner as to include an enhancement, where appropriate, for delay in payment—is a straightfor-

---

[3] Our opinion in *Shaw* does, to be sure, contain some language that, if read in isolation, might suggest a different result in this case. Most significantly, we equated compensation for delay with prejudgment interest, and observed that "[p]rejudgment interest . . . is considered as damages, not a component of 'costs.' . . . Indeed, the term 'costs' has never been understood to include any interest component." *Library of Congress* v. *Shaw*, 478 U. S. 310, 321 (1986). These observations, however, cannot be divorced from the context of the special "no-interest rule" that was at issue in *Shaw*. That rule, which is applicable to the immunity of the United States and is therefore not at issue here, provides an "added gloss of strictness," *id.*, at 318, only where the United States' liability for interest is at issue. Our inclusion of compensation for delay within the definition of prejudgment interest in *Shaw* must be understood in light of this broad proscription of interest awards against the United States. *Shaw* thus does not represent a general-purpose definition of compensation for delay that governs here. Outside the context of the "no-interest rule" of federal immunity, we see no reason why compensation for delay cannot be included within § 1988 attorney's fee awards, which *Hutto* held to be "costs" not subject to Eleventh Amendment strictures.

We cannot share JUSTICE O'CONNOR's view that the two cases she cites, *post*, at 293, demonstrate the existence of an equivalent rule relating to state immunity that embodies the same ultrastrict rule of construction for interest awards that has grown up around the federal no-interest rule. Cf. *Shaw*, *supra*, at 314–317 (discussing historical development of the federal no-interest rule).

ward matter of statutory interpretation. For this question, it is of no relevance whether the party against which fees are awarded is a State. The question is what Congress intended—not whether it manifested "the clear affirmative intent . . . to waive the sovereign's immunity." *Shaw*, 478 U. S., at 321.[4]

This question is not a difficult one. We have previously explained, albeit in dicta, why an enhancement for delay in payment is, where appropriate, part of a "reasonable attorney's fee." In *Pennsylvania* v. *Delaware Valley Citizens' Council*, 483 U. S. 711 (1987), we rejected an argument that a prevailing party was entitled to a fee augmentation to compensate for the risk of nonpayment. But we took care to distinguish that risk from the factor of delay:

> "First is the matter of delay. When plaintiffs' entitlement to attorney's fees depends on success, their lawyers are not paid until a favorable decision finally eventuates, which may be years later . . . . Meanwhile, their expenses of doing business continue and must be met. In setting fees for prevailing counsel, the courts have regularly recognized the delay factor, either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value. See, *e. g., Sierra Club* v. *EPA*, 248 U. S. App. D. C. 107, 120–121, 769 F. 2d 796, 809–810 (1985); *Louisville Black Police Officers Organization, Inc.* v. *Louisville*, 700 F. 2d 268, 276, 281 (CA6 1983). Although delay and the risk of nonpayment are often mentioned in the same breath, adjusting for the former is a distinct issue . . . . We do not suggest . . . that adjustments for delay are

---

[4] In *Shaw*, which dealt with the sovereign immunity of the Federal Government, there was of course no prospective-retrospective distinction as there is when, as in *Hutto* and the present case, it is the Eleventh Amendment immunity of a State that is at issue.

inconsistent with the typical fee-shifting statute." *Id.*, at 716.

The same conclusion is appropriate under § 1988.[5] Our cases have repeatedly stressed that attorney's fees awarded under this statute are to be based on market rates for the services rendered. See, *e. g., Blanchard* v. *Bergeron,* 489 U. S. 87 (1989); *Riverside* v. *Rivera,* 477 U. S. 561 (1986); *Blum* v. *Stenson,* 465 U. S. 886 (1984). Clearly, compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings.[6] We agree, there-

---

[5] *Delaware Valley* was decided under § 304(d) of the Clean Air Act, 42 U. S. C. § 7604(d). We looked for guidance, however, to § 1988 and our cases construing it. *Pennsylvania* v. *Delaware Valley Citizens' Council,* 483 U. S. 711, 713, n. 1 (1987).

[6] This delay, coupled with the fact that, as we recognized in *Delaware Valley,* the attorney's *expenses* are not deferred pending completion of the litigation, can cause considerable hardship. The present case provides an illustration. During a period of nearly three years, the demands of this case precluded attorney Benson from accepting other employment. In order to pay his staff and meet other operating expenses, he was obliged to borrow $633,000. As of January 1987, he had paid over $113,000 in interest on this debt, and was continuing to borrow to meet interest payments. Record 2336–2339; Tr. 130–131. The LDF, for its part, incurred deficits of $700,000 in 1983 and over $1 million in 1984, largely because of this case. Tr. 46. If no compensation were provided for the delay in payment, the prospect of such hardship could well deter otherwise willing attorneys from accepting complex civil rights cases that might offer great benefit to society at large; this result would work to defeat Congress' purpose in enacting § 1988 of "encourag[ing] the enforcement of federal law through lawsuits filed by private persons." *Delaware Valley, supra,* at 737 (BLACKMUN, J., dissenting).

We note also that we have recognized the availability of interim fee awards under § 1988 when a litigant becomes a prevailing party on one issue in the course of the litigation. *Texas State Teachers Assn.* v. *Garland Independent School Dist.,* 489 U. S. 782, 791–792 (1989). In eco-

fore, that an appropriate adjustment for delay in payment — whether by the application of current rather than historic hourly rates or otherwise — is within the contemplation of the statute.

To summarize: We reaffirm our holding in *Hutto* v. *Finney* that the Eleventh Amendment has no application to an award of attorney's fees, ancillary to a grant of prospective relief, against a State. It follows that the same is true for the calculation of the *amount* of the fee. An adjustment for delay in payment is, we hold, an appropriate factor in the determination of what constitutes a reasonable attorney's fee under § 1988. An award against a State of a fee that includes such an enhancement for delay is not, therefore, barred by the Eleventh Amendment.

### III

Missouri's second contention is that the District Court erred in compensating the work of law clerks and paralegals (hereinafter collectively "paralegals") at the market rates for their services, rather than at their cost to the attorney. While Missouri agrees that compensation for the cost of these personnel should be included in the fee award, it suggests that an hourly rate of $15 — which it argued below corresponded to their salaries, benefits, and overhead — would be appropriate, rather than the market rates of $35 to $50. According to Missouri, § 1988 does not authorize billing paralegals' hours at market rates, and doing so produces a "windfall" for the attorney.[7]

---

nomic terms, such an interim award does not differ from an enhancement for delay in payment.

[7] The Courts of Appeals have taken a variety of positions on this issue. Most permit separate billing of paralegal time. See, *e. g.*, *Save Our Cumberland Mountains, Inc.* v. *Hodel*, 263 U. S. App. D. C. 409, 420, n. 7, 826 F. 2d 43, 54, n. 7 (1987), vacated in part on other grounds, 273 U. S. App. D. C. 78, 857 F. 2d 1516 (1988) (en banc); *Jacobs* v. *Mancuso*, 825 F. 2d 559, 563, and n. 6 (CA1 1987) (collecting cases); *Spanish Action Committee*

We begin with the statutory language, which provides simply for "a reasonable attorney's fee as part of the costs." 42 U. S. C. § 1988. Clearly, a "reasonable attorney's fee" cannot have been meant to compensate only work performed personally by members of the bar. Rather, the term must refer to a reasonable fee for the work product of an attorney. Thus, the fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client; and it must also take account of other expenses and profit. The parties have suggested no reason why the work of paralegals should not be similarly compensated, nor can we think of any. We thus take as our starting point the self-evident proposition that the "reasonable attorney's fee" provided for by statute should compensate the work of paralegals, as well as that of attorneys. The more difficult question is how the work of paralegals is to be valuated in calculating the overall attorney's fee.

The statute specifies a "reasonable" fee for the attorney's work product. In determining how other elements of the attorney's fee are to be calculated, we have consistently looked to the marketplace as our guide to what is "reasonable." In *Blum* v. *Stenson*, 465 U. S. 886 (1984), for example, we rejected an argument that attorney's fees for nonprofit legal

---

*of Chicago* v. *Chicago*, 811 F. 2d 1129, 1138 (CA7 1987); *Ramos* v. *Lamm*, 713 F. 2d 546, 558–559 (CA10 1983); *Richardson* v. *Byrd*, 709 F. 2d 1016, 1023 (CA5), cert. denied *sub nom. Dallas County Commissioners Court* v. *Richardson*, 464 U. S. 1009 (1983). See also *Riverside* v. *Rivera*, 477 U. S. 561, 566, n. 2 (1986) (noting lower court approval of hourly rate for law clerks). Some courts, on the other hand, have considered paralegal work "out-of-pocket expense," recoverable only at cost to the attorney. See, *e. g., Northcross* v. *Board of Education of Memphis City Schools*, 611 F. 2d 624, 639 (CA6 1979), cert. denied, 447 U. S. 911 (1980); *Thornberry* v. *Delta Air Lines, Inc.*, 676 F. 2d 1240, 1244 (CA9 1982), vacated, 461 U. S. 952 (1983). At least one Court of Appeals has refused to permit any recovery of paralegal expense apart from the attorney's hourly fee. *Abrams* v. *Baylor College of Medicine*, 805 F. 2d 528, 535 (CA5 1986).

service organizations should be based on cost. We said: "The statute and legislative history establish that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community . . . ." *Id.,* at 895. See also, *e. g., Delaware Valley,* 483 U. S., at 732 (O'CONNOR, J., concurring) (controlling question concerning contingency enhancements is "how the market in a community compensates for contingency"); *Rivera,* 477 U. S., at 591 (REHNQUIST, J., dissenting) (reasonableness of fee must be determined "in light of both the traditional billing practices in the profession, and the fundamental principle that the award of a 'reasonable' attorney's fee under § 1988 means a fee that would have been deemed reasonable if billed to affluent plaintiffs by their own attorneys"). A reasonable attorney's fee under § 1988 is one calculated on the basis of rates and practices prevailing in the relevant market, *i. e.,* "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation," *Blum, supra,* at 896, n. 11, and one that grants the successful civil rights plaintiff a "fully compensatory fee," *Hensley* v. *Eckerhart,* 461 U. S. 424, 435 (1983), comparable to what "is traditional with attorneys compensated by a fee-paying client." S. Rep. No. 94–1011, p. 6 (1976).

If an attorney's fee awarded under § 1988 is to yield the same level of compensation that would be available from the market, the "increasingly widespread custom of separately billing for the services of paralegals and law students who serve as clerks," *Ramos* v. *Lamm,* 713 F. 2d 546, 558 (CA10 1983), must be taken into account. All else being equal, the hourly fee charged by an attorney whose rates include paralegal work in her hourly fee, or who bills separately for the work of paralegals at cost, will be higher than the hourly fee charged by an attorney competing in the same market who bills separately for the work of paralegals at "market rates." In other words, the prevailing "market rate" for attorney time is not independent of the manner in which paralegal

time is accounted for.[8]   Thus, if the prevailing practice in a given community were to bill paralegal time separately at market rates, fees awarded the attorney at market rates for attorney time would not be fully compensatory if the court refused to compensate hours billed by paralegals or did so only at "cost."   Similarly, the fee awarded would be too high if the court accepted separate billing for paralegal hours in a market where that was not the custom.

We reject the argument that compensation for paralegals at rates above "cost" would yield a "windfall" for the prevailing attorney.   Neither petitioners nor anyone else, to our knowledge, has ever suggested that the hourly rate applied to the work of an associate attorney in a law firm creates a windfall for the firm's partners or is otherwise improper under § 1988, merely because it exceeds the cost of the attorney's services.   If the fees are consistent with market rates and practices, the "windfall" argument has no more force with regard to paralegals than it does for associates.   And it would hardly accord with Congress' intent to provide a "fully compensatory fee" if the prevailing plaintiff's attorney in a civil rights lawsuit were not permitted to bill separately for paralegals, while the defense attorney in the same litigation was able to take advantage of the prevailing practice and obtain market rates for such work.   Yet that is precisely the result sought in this case by the State of Missouri, which appears to have paid its own outside counsel for the work of paralegals at the hourly rate of $35.   Record 2696, 2699.[9]

---

[8] The attorney who bills separately for paralegal time is merely distributing her costs and profit margin among the hourly fees of other members of her staff, rather than concentrating them in the fee she sets for her own time.

[9] A variant of Missouri's "windfall" argument is the following: "If paralegal expense is reimbursed at a rate many times the actual cost, will attorneys next try to bill separately—and at a profit—for such items as secretarial time, paper clips, electricity, and other expenses?"   Reply Brief for Petitioners 15–16.   The answer to this question is, of course, that attorneys seeking fees under § 1988 would have no basis for requesting separate

Nothing in § 1988 requires that the work of paralegals invariably be billed separately. If it is the practice in the relevant market not to do so, or to bill the work of paralegals only at cost, that is all that § 1988 requires. Where, however, the prevailing practice is to bill paralegal work at market rates, treating civil rights lawyers' fee requests in the same way is not only permitted by § 1988, but also makes economic sense. By encouraging the use of lower cost paralegals rather than attorneys wherever possible, permitting market-rate billing of paralegal hours "encourages cost-effective delivery of legal services and, by reducing the spiraling cost of civil rights litigation, furthers the policies underlying civil rights statutes." *Cameo Convalescent Center, Inc.* v. *Senn*, 738 F. 2d 836, 846 (CA7 1984), cert. denied, 469 U. S. 1106 (1985).[10]

---

compensation of such expenses unless this were the prevailing practice in the local community. The safeguard against the billing at a profit of secretarial services and paper clips is the discipline of the market.

[10] It has frequently been recognized in the lower courts that paralegals are capable of carrying out many tasks, under the supervision of an attorney, that might otherwise be performed by a lawyer and billed at a higher rate. Such work might include, for example, factual investigation, including locating and interviewing witnesses; assistance with depositions, interrogatories, and document production; compilation of statistical and financial data; checking legal citations; and drafting correspondence. Much such work lies in a gray area of tasks that might appropriately be performed either by an attorney or a paralegal. To the extent that fee applicants under § 1988 are not permitted to bill for the work of paralegals at market rates, it would not be surprising to see a greater amount of such work performed by attorneys themselves, thus increasing the overall cost of litigation.

Of course, purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them. What the court in *Johnson* v. *Georgia Highway Express, Inc.*, 488 F. 2d 714, 717 (CA5 1974), said in regard to the work of attorneys is applicable by analogy to paralegals: "It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available. Such non-legal

Such separate billing appears to be the practice in most communities today.[11] In the present case, Missouri concedes that "the local market typically bills separately for paralegal services," Tr. of Oral Arg. 14, and the District Court found that the requested hourly rates of $35 for law clerks, $40 for paralegals, and $50 for recent law graduates were the prevailing rates for such services in the Kansas City area. App. to Pet. for Cert. A29, A31, A34. Under these circumstances, the court's decision to award separate compensation at these rates was fully in accord with § 1988.

## IV

The courts below correctly granted a fee enhancement to compensate for delay in payment and approved compensation of paralegals and law clerks at market rates. The judgment of the Court of Appeals is therefore

*Affirmed.*

JUSTICE MARSHALL took no part in the consideration or decision of this case.

JUSTICE O'CONNOR, with whom JUSTICE SCALIA joins, and with whom THE CHIEF JUSTICE joins in part, concurring in part and dissenting in part.

I agree with the Court that 42 U. S. C. § 1988 allows compensation for the work of paralegals and law clerks at market rates, and therefore join Parts I and III of its opinion. I do not join Part II, however, for in my view the Eleventh Amendment does not permit enhancement of attorney's

---

work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it."

[11] *Amicus* National Association of Legal Assistants reports that 77 percent of 1,800 legal assistants responding to a survey of the association's membership stated that their law firms charged clients for paralegal work on an hourly billing basis. Brief for National Association of Legal Assistants as *Amicus Curiae* 11.

fees assessed against a State as compensation for delay in payment.

The Eleventh Amendment does not, of course, provide a State with across-the-board immunity from all monetary relief. Relief that "serves directly to bring an end to a violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect" on a State's treasury. *Papasan* v. *Allain*, 478 U. S. 265, 278 (1986). Thus, in *Milliken* v. *Bradley*, 433 U. S. 267, 289–290 (1977), the Court unanimously upheld a decision ordering a State to pay over $5 million to eliminate the effects of *de jure* segregation in certain school systems. On the other hand, "[r]elief that in essence serves to compensate a party injured in the past," such as relief "expressly denominated as damages," or "relief [that] is tantamount to an award of damages for a past violation of federal law, even though styled as something else," is prohibited by the Eleventh Amendment. *Papasan, supra,* at 278. The crucial question in this case is whether that portion of respondents' attorney's fees based on current hourly rates is properly characterized as retroactive monetary relief.

In *Library of Congress* v. *Shaw*, 478 U. S. 310 (1986), the Court addressed whether the attorney's fees provision of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–5(k), permits an award of attorney's fees against the United States to be enhanced in order to compensate for delay in payment. In relevant part, § 2000e–5(k) provides:

> "In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the [Equal Employment Opportunity Commission (EEOC)] or the United States, a reasonable attorney's fees as part of the costs, and the [EEOC] and the United States shall be liable for costs the same as a private person."

The Court began its analysis in *Shaw* by holding that "interest is an element of damages separate from damages on the

substantive claim." 478 U. S., at 314 (citing C. McCormick, Law of Damages § 50, p. 205 (1935)). Given the "no-interest" rule of federal sovereign immunity, under which the United States is not liable for interest absent an express statutory waiver to the contrary, the Court was unwilling to conclude that, by equating the United States' liability to that of private persons in § 2000e–5(k), Congress had waived the United States' immunity from interest. 478 U. S., at 314–319. The fact that § 2000e–5(k) used the word "reasonable" to modify "attorney's fees" did not alter this result, for the Court explained that it had "consistently . . . refused to impute an intent to waive immunity from interest into the ambiguous use of a particular word or phrase in a statute." *Id.*, at 320. The description of attorney's fees as costs in § 2000e–5(k) also did not mandate a contrary conclusion because "[p]rejudgment interest . . . is considered as damages, not a component of 'costs,'" and the "term 'costs' has *never* been understood to include any interest component." *Id.*, at 321 (emphasis added) (citing 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §§ 2664, 2666, 2670 (2d ed. 1983); 2 A. Sedgwick & G. Van Nest, Sedgwick on Damages 157–158 (7th ed. 1880)). Finally, the Court rejected the argument that the enhancement was proper because the "no-interest" rule did not prohibit compensation for delay in payment: "Interest and a delay factor share an identical function. They are designed to compensate for the belated receipt of money." 478 U. S., at 322.

As the Court notes, *ante*, at 281, n. 3, the "no-interest" rule of federal sovereign immunity at issue in *Shaw* provided an "added gloss of strictness," 478 U. S., at 318, and may have explained the *result* reached by the Court in that case, *i. e.*, that § 2000e–5(k) did not waive the United States' immunity against awards of interest. But there is not so much as a hint anywhere in *Shaw* that the Court's discussions and definitions of interest and compensation for delay were dictated by, or limited to, the federal "no-interest" rule. As the

quotations above illustrate, the Court's opinion in *Shaw* is filled with broad, unqualified language. The dissenters in *Shaw* did not disagree with the Court's sweeping characterization of interest and compensation for delay as damages. Rather, they argued only that § 2000e–5(k) had waived the immunity of the United States with respect to awards of interest. See *id.*, at 323–327 (BRENNAN, J., dissenting). I therefore emphatically disagree with the Court's statement that "*Shaw* . . . does not represent a general-purpose definition of compensation for delay that governs here." *Ante,* at 281, n. 3.

Two general propositions that are relevant here emerge from *Shaw.* First, interest is considered damages and not costs. Second, compensation for delay, which serves the same function as interest, is also the equivalent of damages. These two propositions make clear that enhancement for delay constitutes retroactive monetary relief barred by the Eleventh Amendment. Given my reading of *Shaw*, I do not think the Court's reliance on the cost rationale of § 1988 set forth in *Hutto* v. *Finney*, 437 U. S. 678 (1978), is persuasive. Because *Shaw* teaches that compensation for delay constitutes damages and cannot be considered costs, see 478 U. S., at 321–322, *Hutto* is not controlling. See *Hutto, supra,* at 697, n. 27 ("[W]e do not suggest that our analysis would be the same if Congress were to expand the concept of costs beyond the traditional category of litigation expenses"). Furthermore, *Hutto* does not mean that inclusion of attorney's fees as costs in a statute forecloses a challenge to the enhancement of fees as compensation for delay in payment. If it did, then *Shaw* would have been resolved differently, for § 2000e–5(k) lists attorney's fees as costs.

Even if I accepted the narrow interpretation of *Shaw* proffered by the Court, I would disagree with the result reached by the Court in Part II of its opinion. On its own terms, the Court's analysis fails. The Court suggests that the definitions of interest and compensation for delay set forth in *Shaw*

would be triggered only by a rule of sovereign immunity barring awards of interest against the States: "Outside the context of the 'no-interest rule' of federal immunity, we see no reason why compensation for delay cannot be included within § 1988 attorney's fee awards." *Ante*, at 281, n. 3. But the Court does not inquire about whether such a rule exists. In fact, there is a federal rule barring awards of interest against States. See *Virginia* v. *West Virginia*, 238 U. S. 202, 234 (1915) ("Nor can it be deemed in derogation of the sovereignty of the State that she should be charged with interest *if* her agreement properly construed so provides") (emphasis added); *United States* v. *North Carolina*, 136 U. S. 211, 221 (1890) ("general principle" is that "an obligation of the State to pay interest, whether as interest or as damages, on any debt overdue, cannot arise *except* by the consent and contract of the State, manifested by statute, or in a form authorized by statute") (emphasis added). The Court has recently held that the rule of immunity set forth in *Virginia* and *North Carolina* is inapplicable in situations where the State does not retain any immunity, see *West Virginia* v. *United States*, 479 U. S. 305, 310–312 (1987) (State can be held liable for interest to the United States, against whom it has no sovereign immunity), but the rule has not otherwise been limited, and there is no reason why it should not be relevant in the Eleventh Amendment context presented in this case.

As *Virginia* and *North Carolina* indicate, a State can waive its immunity against awards of interest. See also *Clark* v. *Barnard*, 108 U. S. 436, 447 (1883). The Missouri courts have interpreted Mo. Rev. Stat. § 408.020 (1979 and Supp. 1989), providing for prejudgment interest on money that becomes due and payable, and § 408.040, providing for prejudgment interest on court judgments and orders, as making the State liable for interest. See *Denton Construction Co.* v. *Missouri State Highway Comm'n*, 454 S. W. 2d 44, 59–60 (Mo. 1970) (§ 408.020); *Steppelman* v. *State Highway Comm'n of Missouri*, 650 S. W. 2d 343, 345 (Mo. App.

1983) (§ 408.040). There can be no argument, however, that these Missouri statutes and cases allow interest to be awarded against the State here. A "State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts." *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 99, n. 9 (1984).

The fact that a State has immunity from awards of interest is not the end of the matter. In a case such as this one involving school desegregation, interest or compensation for delay (in the guise of current hourly rates) can theoretically be awarded against a State despite the Eleventh Amendment's bar against retroactive monetary liability. The Court has held that Congress can set aside the States' Eleventh Amendment immunity in order to enforce the provisions of the Fourteenth Amendment. See *City of Rome* v. *United States*, 446 U. S. 156, 179 (1980); *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 456 (1976). Congress must, however, be unequivocal in expressing its intent to abrogate that immunity. See generally *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 243 (1985) ("Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself").

In *Hutto* the Court was able to avoid deciding whether § 1988 met the "clear statement" rule only because attorney's fees (without any enhancement) are not considered retroactive in nature. See 437 U. S., at 695–697. The Court cannot do the same here, where the attorney's fees were enhanced to compensate for delay in payment. Cf. *Osterneck* v. *Ernst & Whinney*, 489 U. S. 169, 175 (1989) ("[U]nlike attorney's fees, which at common law were regarded as an element of costs, . . . prejudgment interest traditionally has been considered part of the compensation due [the] plaintiff").

In relevant part, § 1988 provides:

"In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title,

title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

In my view, § 1988 does not meet the "clear statement" rule set forth in *Atascadero*. It does not mention damages, interest, compensation for delay, or current hourly rates. As one federal court has correctly noted, "Congress has not yet made any statement suggesting that a § 1988 attorney's fee award should include prejudgment interest." *Rogers* v. *Okin*, 821 F. 2d 22, 27 (CA1 1987). A comparison of the statute at issue in *Shaw* also indicates that § 1988, as currently written, is insufficient to allow attorney's fees assessed against a State to be enhanced to compensate for delay in payment. The language of § 1988 is undoubtedly less expansive than that of § 2000e–5(k), for § 1988 does not equate the liability of States with that of private persons. Since § 2000e–5(k) does not allow enhancement of an award of attorney's fees to compensate for delay, it is logical to conclude that § 1988, a more narrowly worded statute, likewise does not allow interest (through the use of current hourly rates) to be tacked on to an award of attorney's fees against a State.

Compensation for delay in payment was *one* of the reasons the District Court used current hourly rates in calculating respondents' attorney's fees. See App. to Pet. for Cert. A26–A27; 838 F. 2d 260, 263, 265 (CA8 1988). I would reverse the award of attorney's fees to respondents and remand so that the fees can be calculated without taking compensation for delay into account.

CHIEF JUSTICE REHNQUIST, dissenting.

I agree with JUSTICE O'CONNOR that the Eleventh Amendment does not permit an award of attorney's fees against a State which includes compensation for delay in payment. Unlike JUSTICE O'CONNOR, however, I do not agree with the

Court's approval of the award of law clerk and paralegal fees made here.

Title 42 U. S. C. § 1988 gives the district courts discretion to allow the prevailing party in an action under 42 U. S. C. § 1983 "a reasonable attorney's fee as part of the costs." The Court reads this language as authorizing recovery of "a 'reasonable' fee for the attorney's work product," *ante*, at 285, which, the Court concludes, may include separate compensation for the services of law clerks and paralegals. But the statute itself simply uses the very familiar term "a reasonable attorney's fee," which to those untutored in the Court's linguistic juggling means a fee charged for services rendered by an individual who has been licensed to practice law. Because law clerks and paralegals have not been licensed to practice law in Missouri, it is difficult to see how charges for their services may be separately billed as part of "attorney's fees." And since a prudent attorney customarily includes compensation for the cost of law clerk and paralegal services, like any other sort of office overhead—from secretarial staff, janitors, and librarians, to telephone service, stationery, and paper clips—in his own hourly billing rate, allowing the prevailing party to recover separate compensation for law clerk and paralegal services may result in "double recovery."

The Court finds justification for its ruling in the fact that the prevailing practice among attorneys in Kansas City is to bill clients separately for the services of law clerks and paralegals. But I do not think Congress intended the meaning of the statutory term "attorney's fee" to expand and contract with each and every vagary of local billing practice. Under the Court's logic, prevailing parties could recover at market rates for the cost of secretaries, private investigators, and other types of lay personnel who assist the attorney in preparing his case, so long as they could show that the prevailing practice in the local market was to bill separately for these services. Such a result would be a sufficiently drastic departure from the traditional concept of "attorney's fees" that I

believe new statutory authorization should be required for it. That permitting separate billing of law clerk and paralegal hours at market rates might "'reduc[e] the spiraling cost of civil rights litigation'" by encouraging attorneys to delegate to these individuals tasks which they would otherwise perform themselves at higher cost, *ante*, at 288, and n. 10, may be a persuasive reason for Congress to enact such additional legislation. It is not, however, a persuasive reason for us to rewrite the legislation which Congress has in fact enacted. See *Badaracco* v. *Commissioner*, 464 U. S. 386, 398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement").

I also disagree with the State's suggestion that law clerk and paralegal expenses incurred by a prevailing party, if not recoverable at market rates as "attorney's fees" under § 1988, are nonetheless recoverable at actual cost under that statute. The language of § 1988 expands the traditional definition of "costs" to include "a reasonable attorney's fee," but it cannot fairly be read to authorize the recovery of all other out-of-pocket expenses actually incurred by the prevailing party in the course of litigation. Absent specific statutory authorization for the recovery of such expenses, the prevailing party remains subject to the limitations on cost recovery imposed by Federal Rule of Civil Procedure 54(d) and 28 U. S. C. § 1920, which govern the taxation of costs in federal litigation where a cost-shifting statute is not applicable. Section 1920 gives the district court discretion to tax certain types of costs against the losing party in any federal litigation. The statute specifically enumerates six categories of expenses which may be taxed as costs: fees of the court clerk and marshal; fees of the court reporter; printing fees and witness fees; copying fees; certain docket fees; and fees of court-appointed experts and interpreters. We have held that this list is exclusive. *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.*, 482 U. S. 437 (1987). Since none of these categories can possibly be construed to include the fees of law clerks and paralegals,

I would also hold that reimbursement for these expenses may not be separately awarded at actual cost.

I would therefore reverse the award of reimbursement for law clerk and paralegal expenses.