Jean A. McINTOSH, an individual, and Harding & Ogborn, P.C., etc., Plaintiffs,

v.

PACIFIC HOLDING COMPANY and Pacific Holding Company Employee Welfare Benefit Plan, Defendants.

No. 4:CV95–3123.

United States District Court, D. Nebraska.

July 8, 1998.

Tim Engler, Gregory D. Barton, Harding, Shultz & Downs, Lincoln, NE, for Plaintiffs.

Shawn D. Renner, Cline, Williams, Wright, Johnson & Oldfather, Lincoln, NE, for Defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This case is before me upon remand from the Court of Appeals. *McIntosh v. Pacific Holding Company*, 120 F.3d 911, 912 (8th Cir.1997) (an ERISA plan was silent on the issue of attorney fees for plan beneficiaries who sue third party tortfeasors when the plan is also subrogated to the recovery of the beneficiary; holding that "federal common law gives an action for attorney's fees in circumstances like the present ones (sic), and in an amount equal to 'the value of the [the claimant's] legal services *to the plan;*'" remanding for a determination of whether an attorney's fee is appropriate and, if so, what amount the award should be) (quoting *Waller v. Hormel Foods*, 120 F.3d 138, 141 (8th Cir.1997)) (emphasis in *Waller*).

The plaintiffs and defendants have filed cross motions for summary judgment in an effort to end this seemingly endless litigation. They agree that the material facts are undisputed. They further agree that even if the material facts are disputed I may resolve the case without trial based upon their stipulations. I will grant the plaintiffs' motion in part, award an attorney fee of $24,012.29 plus interest from April 12, 1990, and otherwise deny the motion. I will also deny the defendants' motion for summary judgment.

## I.

Most of the material facts are set forth in my prior opinion. *McIntosh v. Pacific Holding Co.*, 928 F.Supp. 1464, 1466–71 (D.Neb. 1996). Since the Court of Appeals disagreed with my legal conclusions, and not my recitation of the facts, it is appropriate to simply incorporate my previous description of the facts into this opinion without stating them again. Taking those facts together with the new factual information provided by the parties and condensing them, the material undisputed facts may be summarized as follows:

1. Jean A. McIntosh hired Harding and Ogborn to represent McIntosh and her minor daughter, Kristin, regarding a July 31, 1988 accident that severely injured Kristin. Kristin and her mother ultimately incurred medical expenses exceeding $500,000, and the defendants have paid a very large fraction of those expenses. Harding and Ogborn took the case on a contingency fee basis; that is, the firm was to be paid 15 percent of the first $25,000 and one-third of all sums exceeding $25,000. The negligent driver of the car that injured Kristin was Leonard Hawkins, and there never was serious doubt that Hawkins was liable. Nevertheless, the parties have stipulated that Harding and Ogborn investigated the facts and developed the evidence necessary to prove that Hawkins was liable and that Kristin and her mother suffered special damages in excess of $430,000.

2. As the daughter of an employee, Kristin was a "covered person" under the Pacific Holding Company Employee Welfare Benefit Plan (the Plan). This meant that the Plan had an obligation to Kristin (and her mother) to pay her medical bills. This also meant that the Plan had a subrogation right to any recovery that Kristin might make against a third party. The Court of Appeals has stated that the Plan "was silent on the subject of attorney's fees." *McIntosh*, 120 F.3d at 912.

3. Following the accident, claims were submitted to the Plan. The Plan initially began to pay the claims. After an exchange of correspondence in which Ms. McIntosh, through her lawyers, made it clear that she believed the Plan was not entitled to reimbursement should she or Kristin prevail in a suit against Hawkins, the Plan held up making further payments. On December 20, 1988, the defendants retained the Cline–Williams firm in Nebraska to represent their interests given the dispute over the subrogation issue. On January 4, 1989 Ms. McIntosh signed a letter and an agreement that acknowledged the Plan's subrogation claim, but reserved the right to litigate the issue. In turn, the Plan began to pay Kristin's extensive medical expenses.

4. Although two insurance companies had offered to pay the policy limits of their respective policies without suit if Hawkins was given a complete release, this was unsatisfactory to Ms. McIntosh. At least one of the reasons that she was unwilling to accept the tender of the insurance was her concern that

Hawkins might have some assets over and above the insurance proceeds out of which additional monies might be obtained if a judgment was entered. She was unwilling to give a release without sworn evidence of insolvency on the part of Hawkins. On June 20, 1989, the plaintiff filed suit against Hawkins in state court.

5. The plaintiffs and the defendants discussed settlement of their subrogation dispute during this time, and the plaintiffs consistently argued that if a subrogation interest existed then the defendants should pay a pro rata portion of the McIntoshs' attorney fees. The defendants consistently denied that they were obligated to pay a pro rata share of those fees. During this period, the plaintiffs tried to add the defendants to the state court litigation and the defendants resisted that effort.

6. On April 10, 1990, after Hawkins had given sworn testimony that he was insolvent, Ms. McIntosh and Kristin settled with Hawkins for the limits of the insurances policies or $250,500. On April 11, 1990, the monies were placed in escrow pending resolution of the plaintiffs' dispute with the defendants over the issue of subrogation. Confirming documents were exchanged for a number days following the escrow deposit.

7. On November 21, 1990 the plaintiff filed suit in this court. After a favorable decision for Ms. McIntosh, the Court of Appeals reversed and determined that the defendants were entitled to the entire amount of the settlement proceeds. *McIntosh v. Pacific Holding Company,* 992 F.2d 882 (8th Cir.), *cert. denied,* 510 U.S. 965, 114 S.Ct. 441, 126 L.Ed.2d 375 (1993). After an unsuccessful effort to obtain review by the Supreme Court, judgment was entered for the defendants on July 23, 1993.

8. This litigation then ensued. On June 18, 1996, I granted summary judgment for the defendants. As noted earlier, the Court of Appeals reversed and remanded this case to me in the fall of 1997. Thereafter, the parties engaged in further discovery.

9. At the time of my initial decision on June 18, 1996, the parties stipulated that the defendants had paid Cline–Williams more than $45,000 for representation in these matters. The parties also stipulated that Harding and Ogborn claimed a contingency fee of approximately one-third of the insurance recovery according to the terms of a written fee agreement with the McIntoshs. The plaintiffs and the defendants also agreed that Harding and Ogborn maintained contemporaneous time records showing that it had expended approximately 382 hours on this case and if that expenditure of time was billed at standard hourly rates for the firm the fee would have been $34,430.50 plus out-of-pocket expenses of $5,969.57. Those time records are in evidence. (Filing 26, Ex. 8 at Ex. Y.).

10. Out of eight cases in which a Plan beneficiary pursued a third party tortfeasor and in which the Plan claimed a subrogation interest, the defendants had thought it necessary to hire counsel in only this case. There is no evidence that the defendants have ever paid a beneficiary's lawyer in a case similar to this one.

11. The Plan agreed on October 28, 1994, in exchange for HealthCare Recoveries, Inc.'s agreement to collect subrogation claims against third party tortfeasors, to compensate the company at the rate of one-third of the amount recovered. The agreement did not provide that HealthCare Recoveries had the power to bind the defendants to pay the fees of the beneficiary's lawyer, and HealthCare Recoveries does not bind itself to do so by virtue of that agreement.

## II.

The plaintiffs make the following arguments: (1) Harding and Ogborn is entitled to recover the contingency fee set forth in the written agreement with McIntosh; (2) if the firm is not entitled to the contingency fee, then Harding and Ogborn is entitled to $24,012.29 ($22,720.75 fees and $1,291.54 expenses) which represents the fee, billed at customary rates, that the firm would have been paid to create the common fund if the firm had been hired on an hourly basis.

The defendants respond by arguing that (1) Harding and Ogborn is not entitled to anything because the Plan provides that the administrator has interpretative discretion and the administrator would not have agreed to pay any fee in this case; (2) Harding and

Ogborn is not entitled to anything since the insurance companies obligated to defend Hawkins would have paid without the necessity of filing suit; (3) the Plan's later agreement to pay a company one-third of any subrogation recovery does not entitle Harding and Ogborn to a contingency fee in this case; (4) if Harding and Ogborn is entitled to a fee, the award should not exceed $8,000.

I will briefly consider each of these arguments. In the context of that consideration, I will also explain my reasons for the decision to award fees and related expenses of $24,012.29.

## A. The Contingency Fee Agreements

■ The contingency fee agreement between the McIntoshs and Harding and Ogborn does not establish the value received by the Plan for the services of counsel in pursuing Hawkins; that is, the plaintiffs have not convinced me that "the Plan would have made the same arrangement that [the] McIntosh[s] did if it had itself engaged a lawyer to pursue a case against the tortfeasor." *McIntosh*, 120 F.3d at 912. It is the plaintiffs' burden to make such a showing. *Id.*

The case against the tortfeasor was clear as to liability. It was also apparent that there was insurance coverage that would pay a substantial portion of that liability. Still further, the amount of the subrogation claim was very large thus making it obvious that counsel would receive a windfall if the defendants agreed to a contingency fee. I do not believe the defendants, given their relative sophistication and the fiduciary obligation they owed to other plan participants, would have agreed to a contingency fee under these circumstances. Rather, I believe that the defendants would have engaged counsel at an appropriate hourly rate to pursue the tortfeasor.

In addition, I do not believe that the 1994 contingency fee agreement between the defendants and HealthCare Recoveries, Inc., establishes that a one-third contingency fee arrangement would have been entered into between the defendants and the plaintiffs' counsel to pursue Hawkins. I have three reasons for this view.

The 1994 agreement tells us something about the defendants' thinking in 1994, but it tells us nothing about what the defendants would have done in 1988 when the accident occurred or in 1990 when settlement was reached with Hawkins and the insurance companies. Moreover, the 1994 agreement was between a company bound to primarily serve the interests of the defendants and not an underlying claimant (like Kristin). Thus, it is difficult to compare the two relationships. Finally, there is no evidence that the defendants have ever paid a lawyer for someone like Kristin in order to recover the defendants' subrogation interest. Consequently, if the defendants never paid a claimant's counsel under any circumstance, there is reason to doubt that the defendants would have agreed to a contingency fee arrangement in this case where the likelihood that such an arrangement would provide a windfall to counsel was apparent.

In summary, the contingency fee agreements are not persuasive. They fail to establish that the defendants would have agreed to pay a contingency fee in this case, and there is no other evidence that shows that the defendants would have agreed to such a relationship.

## B. The Proper Fee

I next examine whether a fee is proper. I then decide the proper amount of the fee.

### 1.

■ Despite the fact that liability was clear and the insurance companies were anxious to settle, the defendants received something of value from the work of Harding and Ogborn. Initially, some investigation had to be conducted, and the proof of liability and damages had to be assembled. Someone had to do this work. Without the work, the defendants could not reasonably expect to receive anything.

Also, it is clear that Kristin and her mother reasonably did not want to settle the case unless and until they could satisfy themselves that Hawkins was judgment proof, and, after all, they were the claimants entitled to prosecute any claim against Hawkins—the defendants had no such right. Counsel was needed to accomplish this task, and filing suit was one good way to accomplish this goal. To the extent that Harding and Ogborn satisfied Kristin and her mother that the insurance

was the only source of recovery, Harding and Ogborn expedited the defendants' eventual recovery of those proceeds.

Furthermore, and perhaps most importantly, it was in the defendants' interest to be sure that Hawkins was judgment proof because the covered medical expenses far exceeded the amount of insurance coverage. Thus, the efforts of Harding and Ogborn in nailing down the judgment proof status of Hawkins furthered the fiduciary responsibility of the defendants to other plan participants not to take "easy money" at the expense of a more complete recovery.

The defendants argue that although the terms of the plan are silent about attorney fees, the terms of the plan grant the plan administrator interpretative discretion. Hence the defendants argue that the plan administrator would not have authorized any agreement with a beneficiary's lawyer, and I should deny a fee as a matter of law.

The simple answer to this assertion is that it is foreclosed by the Court of Appeals' decision. The Court of Appeals made clear that "in circumstances like the present one," meaning where the plan terms are "silent on the subject of attorney's fees," a district court errs when it holds "as a matter of law, no such fee was available." *McIntosh*, 120 F.3d at 912.

The somewhat longer answer to this assertion is that there is no evidence proving that the plan administrator relied upon the interpretative discretion provision of the plan document. In other words, the defendants must prove that the administrator actually thought about the issue and relied upon the interpretative discretion afforded the administrator before I can find a factual basis for concluding that the administrator actually did what the defendants claim the administrator did. All I know with certainty is that the defendants (including presumably the plan administrator) refused to pay anything to Harding and Ogborn. I have insufficient evidence to decide what, if any, principled reason motivated the defendants. It would

therefore be speculative to conclude that the plan administrator exercised the interpretative discretion afforded the administrator.

In short, the work of Harding and Ogborn was valuable to the defendants. The work developed the evidence proving liability and damages, and thus the work was the foundation for any recovery against Hawkins. The work also satisfied Kristin and her mother that Hawkins was judgment proof and therefore expedited the defendants' recovery. Finally, the work furthered the fiduciary obligation of the defendants to satisfy themselves that they had expended reasonable efforts to fully collect the subrogation interest from Hawkins.

**2.**

■ "If [they] had [themselves] engaged a lawyer to pursue a case against the tortfeasor [Hawkins]," as the Court of Appeals has required me to assume, *McIntosh*, 120 F.3d at 912, the defendants would have entered into an hourly rate agreement, also promising to pay reasonable out-of-pocket expenses. The hourly rates charged by Harding and Ogborn as shown in the stipulated evidence are fair and reasonable (as of the date the hours were worked), and the defendants do not contest those rates.

Still further, after careful review of the firm's records (Ex. Y to Ex. 8 to Filing 26), I conclude that the alternative fee requested by Harding and Ogborn of $24,012.29 ($22,720.75 in fees + $1,291.54 in expenses) is the correct fee to award pursuant to the Court of Appeals' instructions. This fee includes my estimate that roughly 260 hours were actually expended between August 1, 1988, (the start of the engagement), and April 12, 1990, (the day after payment of the insurance monies), to recover the insurance proceeds and disburse them to the proper party.[1]

This award means that the effective hourly rate paid to Harding and Ogborn ($22,720.75 divided by 260) will be about $87.00. This is a fair rate for the time period under consid-

---

1. The time entries set forth in the plaintiffs' brief and upon which the fee is based were independently reviewed. In general, I agree that those entries are properly billable to the defendants. However, I do not agree that every entry is billable to the defendants. Rather, after my in-

dependent review, I found the fee claimed by Harding and Ogborn is generally supported by time entries in the record including most, but not all, of those identified by the firm. Indeed, had I relied upon my independent calculation, the fee award would have been slightly higher.

eration. I also am convinced that 260 hours expended to recover $250,500 in a case like this one is a reasonable expenditure of time. In addition, this fee includes out-of-pocket expenses necessarily expended to recover the insurance proceeds ($1,291.54), but excludes all other expenses. The fee does not include my estimate of work that is fairly attributable to efforts aimed at defeating the defendants' subrogation interest.

■ Harding and Ogborn request interest on their fees. From my examination of the evidence, it appears that Harding and Ogborn calculated their fees based upon the rates historically charged rather than upon their current rates. It is generally appropriate to award lawyers increased fees when there has been a long delay in payment. Increased fees are appropriate because the consequence of delay in payment in the market place is a higher bill from your lawyer. *See, e.g., Missouri v. Jenkins*, 491 U.S. 274, 283–84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (approving enhancement for delay in payment in civil rights case because that is what the market would do). While I usually deal with delay in payment issues by using current hourly rates rather than historic rates, the same thing can be done in other ways. *Id.* I believe the current judgment rate of interest will adequately compensate Harding and Ogborn for any delay in payment; that is, the sum of $24,012.29 will draw interest at the current judgment rate of 5.413 percent, with interest accruing from April 12, 1990 until paid.

■ The defendants argue, as they did when I first granted their motion for summary judgment, that the services provided by Harding and Ogborn resulted in no ."net" benefit to the defendants. In other words, the defendants argue that because they had to pay Cline–Williams more than $45,000, the services of Harding and Ogborn provided no benefit to the defendants. I reject this argument

The decision of the Court of Appeals, reversing my prior decision, must have considered and rejected defendants' "net benefit" argument since my prior decision directly

addressed that issue. *McIntosh*, 928 F.Supp. at 1477–78. To now reconsider that issue would amount to ignoring the basic premise of the Court of Appeals' decision; that is, the Court of Appeals held that my prior decision (presumably including my "net benefit" analysis) was wrong. As a judge of an inferior court, I must faithfully follow both the spirit and the letter of an appellate court's decision as best I can. Reconsidering the "net benefit" argument would not be faithful to what I understand as the premise for the appellate court's decision.

It should also be remembered that as of November 29, 1990 the defendants had only paid Cline–Williams $7,338 in fees and expenses. *Id.* at 1470–71 (finding 34). If the defendants had paid or tendered the sum I now award to Harding and Ogborn ($24,012.29) in the spring of 1990 when the money went into escrow, the total lawyer fees incurred at that time to generate the recovery (Harding and Ogborn) and represent the interests of the defendants (Cline–Williams) would have been less than $32,000 ($24,012.29 + $7,338=$31,350.29).

Thirty-two thousand dollars would have been a reasonable fee for the defendants to have paid in April of 1990 considering their subrogation interest was over $250,000. I interpret the Court of Appeals' decision as a direction to determine the value (if any) of .Harding and Ogborn's services as of the date the insurance funds came into escrow since that is the date the funds were essentially paid to the proper party.[2] If both of these facts are true (an aggregate fee of $32,000 calculated as of April of 1990 is reasonable and that time is the appropriate period to determine the issue), then the defendants' net benefit argument lacks merit because the defendants did in fact receive a net benefit from the work of Harding and Ogborn even though they also paid their own lawyers $7,338.

Accordingly,

IT IS ORDERED that:

**2.** The escrow agreement provided that the insurance proceeds would draw interest. Thus, when the defendants received the funds ·from the es-

crow agent the defendants received the proceeds they were entitled to plus interest.

1. The plaintiffs' motion for summary judgment, (filing 48), is granted in part and the plaintiffs are awarded the sum of $24,012.29, which sum will draw interest at the rate of 5.413 percent from April 12, 1990 until judgment is entered computed in accordance with 28 U.S.C. § 1961(b), plus interest thereafter as provided by law. Otherwise, the plaintiffs' motion for summary judgment, (filing 48), is denied.

2. The defendants' motion for summary judgment (filing 47) is denied.

3. Judgment shall be entered by separate document.