Jean A. McINTOSH, etc.,
et al., Plaintiffs,

v.

PACIFIC HOLDING COMPANY,
et al., Defendants.

No. 4:CV95–3123.

United States District Court,
D. Nebraska.

June 18, 1996.

1465

Tim Engler, Gregory D. Barton, Harding, Schultz & Downs, Lincoln, NE, for Plaintiffs.

Shawn D. Renner, Cline, Williams, Wright, Johnson & Oldfather, Lincoln, NE, for Defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Based upon stipulated facts, the parties have filed cross-motions for summary judgment. This case requires me to determine the applicability of the so-called "common fund" attorney fee doctrine to a health benefits plan governed by the Employee Retirement Income Security Act (ERISA). *See* 29 U.S.C. § 1001, *et seq.*

Specifically, Plaintiffs (a plan participant and her lawyers) ask me to determine whether a health benefits plan governed by ERISA and the employer which created the plan are liable for an attorney fee allegedly earned when the plan participant and her lawyers

successfully prosecuted a claim against third-parties but also vigorously, albeit unsuccessfully, opposed the plan's claim that it was entitled to the proceeds.

All parties agree that ERISA provides no rule of decision on the questions presented by this case.

I find and conclude that the motion for summary judgment should be granted in favor of the defendants because a "party may not recover and try to monopolize a fund, but then, failing in the attempt, declare it a 'common fund' and obtain his expenses from those whose rightful share of the fund he sought to appropriate." *United States v. Tobias*, 935 F.2d 666, 668 (4th Cir.1991).

## I. UNDISPUTED MATERIAL FACTS

From the stipulation of the parties (filing 26, Ex. 8)[1] the undisputed facts which are material to resolution of the motions for summary judgment are these:

1. Jean A. McIntosh is a resident of Lincoln, Lancaster County, Nebraska. Jean A. McIntosh was at all times relevant to this suit the duly appointed conservator of her daughter Kristin K. McIntosh, who at all times relevant to this suit was a protected minor person.

2. Harding and Ogborn (H & O) is a law firm with its principal place of business in Lincoln, Lancaster County, Nebraska, and is successor in interest to the law firm of Nelson & Harding, P.C.

3. Pacific Holding Company (PHC) is the Plan Administrator of the Pacific Holding Company Employee Welfare Benefit Plan (the Plan). PHC is a sole proprietorship with its principal place of business in Los Angeles, California. The Plan is a qualified plan under ERISA. The Plan is self-funded; it is not insured with respect to health benefits. Attached to the stipulation as *Exhibit "A"* is a full, complete, and accurate copy of the Plan.

4. Jean A. McIntosh is and was at all times relevant to this suit an employee of The Cornhusker Hotel, located in Lincoln, Lancaster County, Nebraska. The Cornhusker Hotel is owned by PHC. As an employee of The Cornhusker Hotel, Jean A. McIntosh was and is a beneficiary and "covered person" of the Plan.

5. Kristin K. McIntosh is a beneficiary and a "covered person" of the Plan because she is and was a "dependent" within the meaning of the Plan's definition of that term, and she has satisfied the "dependent eligibility" requirements of the Plan.

6. On approximately July 31, 1988, Kristin K. McIntosh was a passenger in a vehicle driven by Andrea C. Stephens, and owned by Robert L. Stephens. At the intersection of 11th and D Streets, Lincoln, Nebraska, the vehicle was involved in a two-car accident with a vehicle owned and driven by Leonard Hawkins. As a direct result of the accident, Kristin K. McIntosh suffered severe and permanent physical injuries. Kristin K. McIntosh suffered pain from the injury and suffered loss of enjoyment of life. She has continued to incur pain and suffering and substantial loss of income and related damages, and such losses will likely continue for the remainder of her natural life as a result of her permanent injuries.

7. As a result of the serious, permanent injuries to Kristin K. McIntosh, Jean A. McIntosh incurred medical and related expenses in excess of $500,000. The vast majority of such medical expenses were paid by the Plan pursuant to its terms, and to date the Plan has paid in excess of $500,000 for medical and related expenses incurred by or on behalf of Kristin K. McIntosh.

8. Following the above-described collision, Jean A. McIntosh retained Nelson & Harding, P.C., to represent her, individually, and on behalf of her daughter Kristin in an action against Leonard Hawkins. Nelson & Harding agreed to represent Jean A. McIntosh on a contingent-fee basis. Attached to the stipulation as *Exhibit "B"* is a full, complete, and accurate copy of the contingent-fee

---

1. After the stipulation was executed, the parties submitted additional materials by agreement and with leave of the court. (Filing 28). I have carefully reviewed these additional materials. They do not materially change the stipulation that forms the primary basis for the findings of fact recited in the text.

agreement between Jean A. McIntosh and Nelson & Harding.

9. Nelson & Harding conducted an investigation of the facts preparatory to legal action against Leonard Hawkins and other potentially liable parties. Such investigation resulted in the development of facts supporting the imposition of liability upon Leonard Hawkins because the above-described accident was caused by the negligence of Leonard Hawkins, and of facts establishing Jean A. McIntosh and Kristin K. McIntosh had sustained special damages in excess of $430,000.

10. At the time of the accident of July 31, 1988, the vehicle Hawkins was driving was insured to a maximum of $100,000 under a liability insurance policy issued by the Nebraska Division of the State Farm Automobile Insurance Company of Bloomington, Illinois, policy # 2113 456–27A, which policy was in full force and effect on July 31, 1988.

11. Robert Stephens, the owner of the vehicle in which Kristin K. McIntosh was a passenger at the time of the accident, was insured under an insurance policy issued by Allied Mutual Insurance Company of Des Moines, Iowa, policy # AAP 0002599710–4, which policy was in full force and effect on July 31, 1988. The Allied policy provided underinsured motorist coverage in a maximum amount of $250,500, of which only $150,500 was available due to the subrogation provision contained in the Allied policy.

12. Following the accident of July 31, 1988, Jean A. McIntosh filed claims with the Plan for medical and related expenses incurred for the treatment of Kristin K. McIntosh's personal injuries. The Plan initially made payments for these medical and related expenses. On September 7, 1988, Penn General Services, acting as a third-party claims supervisor on behalf of the Plan, sent to Jean McIntosh a standard form letter which required McIntosh to acknowledge by her signature the Plan's right of subrogation and reimbursement from payments she may receive from responsible third parties (referred to hereafter as "subrogation letter"). Jean McIntosh altered the language of the subrogation letter by deleting parts thereof and adding additional language, signed the altered subrogation letter, and returned it to Penn General Services. A true and correct copy of the subrogation letter, including Jean McIntosh's alterations, is attached to the stipulation as *Exhibit "C"*. A true and correct copy of the standard form subrogation letter, without the handwriting addressing the letter to Jean McIntosh and without McIntosh's alterations, is attached to the stipulation as *Exhibit "D"*.

13. On October 17, 1988, Penn General Services wrote to Jean McIntosh to advise her that the alterations she made to the subrogation letter were unacceptable to PHC. The October 17, 1988 letter enclosed another form subrogation letter and asked Jean McIntosh to sign and date the form without altering it. The October 17, 1988 letter from Penn General Services to Jean McIntosh informed McIntosh that charges incurred for Kristin were being held pending receipt of the signed, unaltered subrogation letter. A true and correct copy of the October 17, 1988 letter from Penn General Services to McIntosh is attached hereto as *Exhibit "E"*.

14. Attorney Tim Engler responded to *Exhibit "E"* by a letter to Penn General Services dated November 3, 1988. A true and correct copy of Engler's November 3, 1988 letter to Penn General Services is attached to the stipulation as *Exhibit "F"*. Donald Spuehler, a Los Angeles attorney representing PHC and the Plan, responded to Engler's November 3, 1988 letter in a letter to Engler dated November 9, 1988. A true and correct copy of Spuehler's November 9, 1988 letter to Engler is attached to the stipulation as *Exhibit "G"*.

15. On November 14, 1988 Engler wrote to Penn General Services. Engler's November 14, 1988 letter described the third-party insurance available to compensate for Kristin McIntosh's injuries and to satisfy the Plan's subrogation and reimbursement interest. The letter requested that the Plan consider "waiving" its subrogation interest. A true and correct copy of Engler's November 14, 1988 letter to Penn General Services is attached to the stipulation as *Exhibit "H"*.

16. On December 13, 1988, Engler wrote a ten-page letter to Spuehler which set out in detail McIntosh's position regarding the Plan's subrogation and reimbursement provision. A true and correct copy of Engler's December 13, 1988 letter to Spuehler is attached to the stipulation as *Exhibit "I"*.

17. Following receipt of Engler's December 13, 1988 letter to him, Spuehler advised PHC that it appeared likely that litigation would result from the different views of the Plan's subrogation and reimbursement rights held by PHC and McIntosh, and suggested that PHC retain Nebraska counsel experienced in ERISA litigation. On December 20, 1988, PHC retained the firm of Cline, Williams, Wright, Johnson & Oldfather ("CWWJ & O") to represent its interest in connection with McIntosh's medical claims against the Plan and the Plan's subrogation or reimbursement rights relating to any recovery McIntosh might make against third parties.

18. On December 22, 1988, Engler wrote to Kathleen Jaudzemis, then an attorney affiliated with CWWJ & O, to further explain McIntosh's position regarding the "subrogation letter." A true and correct copy of Engler's December 22, 1988 letter to Jaudzemis is attached to the stipulation as *Exhibit "J"*.

19. On December 30, 1988, Mike Mueller, an attorney affiliated with CWWJ & O, wrote on behalf of the Plan to representatives of the insurers (State Farm and Allied) on whom McIntosh had made claims for Kristin's accident and injuries. Those letters advised the insurers of the Plan's claimed rights of subrogation or reimbursement. True and correct copies of Mueller's December 30, 1988 letters to State Farm and Allied are attached to the stipulation as *Exhibits "K" and "L"*, respectively.

20. Also on December 30, 1988, James Tatom, vice president of PHC, wrote to Engler to advise Engler of the Plan's continuing position that McIntosh was required to execute the "subrogation letter." A true and correct copy of Tatom's December 30, 1988

letter to Engler is attached to the stipulation as *Exhibit "M"*.

21. On January 4, 1989, Engler wrote to Mueller, and sent copies of the letter to State Farm and Allied. Engler's January 4, 1989 letter to Mueller asserted that Mueller had misrepresented McIntosh's position regarding the Plan's subrogation or reimbursement right in his December 30, 1988 letter to the insurers. A true and correct copy of Engler's January 4, 1989 letter to Mueller is attached to the stipulation as *Exhibit "N"*.

22. On January 4, 1989, Jean A. McIntosh executed the previously described "subrogation letter" and a document captioned "Acknowledgment and Agreement," including at the bottom of each such document a legend. This legend provided that Jean A. McIntosh's execution of such documents did not constitute a waiver or relinquishment of her rights and those of Kristin K. McIntosh to seek a judicial determination of the Plan's rights to subrogation or reimbursement, or lack thereof. Thereafter, the Plan continued, and has continued, paying the medical expenses incurred on behalf of Kristin K. McIntosh by Jean A. McIntosh. True and correct copies of the "subrogation letter" and the "Acknowledgment and Agreement" are attached to the stipulation as *Exhibits "O" and "P"*.

23. Also on January 4, 1989, Engler wrote to Tatom; this letter enclosed the executed "subrogation letter" and Acknowledgment and Agreement, and further explained McIntosh's position regarding those documents. A true and correct copy of Engler's January 4, 1989 letter to Tatom is attached to the stipulation as *Exhibit "Q"*.

24. Although both insurers had offered to pay the policy limits of their respective policies without the filing of a lawsuit by McIntosh, Hawkins's liability insurer (State Farm) insisted that Hawkins receive a full release in exchange for payment of its policy limits. That condition was unacceptable to McIntosh. McIntosh and H & O contend that PHC and the Plan agreed with or acquiesced in the decision to initiate litigation against Hawkins; PHC and the Plan deny that contention.[2] The best and only evidence on this

---

2. I am not persuaded that the Defendants ac-    quiesced in the decision to initiate the litigation.

point is set forth in paragraph 27 of the stipulation, particularly in *Exhibits "T", "U", and "V".* On June 20, 1989, Tim Engler, counsel for Jean A. McIntosh, filed in the District Court of Lancaster County, Nebraska, two separate pleadings, each entitled "Petition and Praecipe," thereby initiating two separate civil actions against Leonard Hawkins, one on behalf of Jean A. McIntosh, individually, and the other on behalf of Jean A. McIntosh, as conservator for Kristin K. McIntosh. These cases were entitled *Jean A. McIntosh, Plaintiff v. Leonard Hawkins, Defendant,* Docket 441, Page 233; and *Jean A. McIntosh, in her capacity as conservator for the conservatorship of Kristin K. McIntosh, Plaintiff v. Leonard Hawkins, Defendant,* Docket 441, Page 232. PHC and the Plan were timely notified of the filing of these two state-court lawsuits.

25. McIntosh, PHC, and the Plan discussed settlement of their claims regarding the Plan's reimbursement and subrogation provision over an extended period of time. During those discussions, McIntosh consistently took the position that if the Plan had a valid subrogation or reimbursement interest, then the Plan was obliged to pay a pro rata portion of the attorneys fees due H & O in connection with its efforts to collect from third parties; PHC and the Plan consistently denied any such obligation.

26. During the state court litigation, Hawkins moved to add PHC and the Plan as parties. PHC and the Plan submitted a brief opposing the motion; a true and correct copy of that letter brief is attached to the stipulation as *Exhibit "R".* McIntosh also opposed the motion; a true and correct copy of McIntosh's letter brief opposing the motion is attached to the stipulation as *Exhibit "S".*

27. On November 15, 1989, Pat Healey, the attorney representing Hawkins in the state court litigation, wrote to Greg Barton, one of McIntosh's attorneys, regarding the Hawkins litigation. A true and correct copy of Healey's November 15, 1989 letter to Greg Barton is attached to the stipulation as *Exhibit "T".* Healey's letter, in turn, provoked

correspondence between counsel representing PHC, the Plan, and McIntosh. On November 16, 1989, Jaudzemis wrote to Barton; a true and correct copy of Jaudzemis's November 16, 1989 letter to Barton is attached the stipulation as *Exhibit "U".* Tim Engler responded to Jaudzemis's letter on December 4, 1989; a true and correct copy of Engler's December 4, 1989 letter to Jaudzemis is attached to the stipulation as *Exhibit "V".*

28. Hawkins provided sworn evidence that he was, for practical purposes, judgment-proof. McIntosh agreed to settle the state court litigation by dismissing the two suits and releasing Hawkins in exchange for payment of the policy limits of both insurance policies. McIntosh, PHC, and the Plan agreed that the insurance policy proceeds would be placed in an interest-accumulating escrow account pending resolution of their dispute regarding the applicability of the Plan's subrogation and reimbursement provision. On approximately April 10, 1990, Jean A. McIntosh, as conservator for Kristin K. McIntosh, Jean A. McIntosh, individually, PHC, Leonard Hawkins, State Farm Mutual Automobile Insurance Company, Robert L. Stephens, Andrea Stephens, and Allied Mutual Insurance Company entered into a settlement agreement. By the terms of the settlement agreement, the proceeds of the insurance policies of Leonard Hawkins and Robert L. Stephens were paid to the conservator and PHC, jointly, to be placed in escrow pursuant to an escrow agreement involving Jean A. McIntosh as conservator for Kristin K. McIntosh, PHC, and FirsTier Bank. A true and correct copy of the settlement agreement is attached to the stipulation as *Exhibit "W".* A true and correct copy of the escrow agreement is attached to the stipulation as *Exhibit "X".*

29. On November 21, 1990, Jean A. McIntosh filed a complaint in the United States District Court for the District of Nebraska, in a case entitled *Jean A. McIntosh, individually and as Conservator for Kristin K. McIntosh, a protected person, Plaintiff v.*

At the very most the evidence suggests a misunderstanding. Although I do not believe this dispute is "material" to a resolution of the motions,

the parties have agreed that I should resolve all such disputes without a trial based upon the motions for summary judgment. (Filing 27.)

*Pacific Holding Company and the Pacific Holding Company Employee Welfare Benefit Plan, Defendants,* Case No. 4:90CV471. This 1990 federal litigation was brought pursuant to 29 U.S.C. §§ 1104, 1105, and 1132 of ERISA, and sought a declaratory judgment to resolve the dispute between McIntosh and the Plan regarding entitlement to the escrowed settlement funds obtained in connection with the state court litigation. McIntosh, H & O, PHC, and the Plan stipulate that the court may take judicial notice of all pleadings and documents contained in the court file in Case No. 4:90CV471.

30. On March 6, 1992, the United States District Court for the District of Nebraska, Honorable Warren K. Urbom presiding, ruled on cross motions for summary judgment. Judge Urbom denied the motion for summary judgment of PHC and the Plan and granted summary judgment in favor of Jean A. McIntosh, specifically declaring that PHC and the Plan had no right of subrogation to any of the settlement proceeds recovered in the McIntosh personal injury litigation against Leonard Hawkins, and that Jean A. McIntosh, as conservator for Kristin K. McIntosh, was entitled to all such settlement proceeds. Judge Urbom's summary judgment memorandum and order declined to award H & O an attorney fee under ERISA. However, at H & O's request, Judge Urbom reconsidered that decision and ultimately awarded H & O an attorney fee in the amount of $29,947.09, and expenses in the amount of $566.97, by order dated October 2, 1992. Thereafter, PHC and the Plan appealed to the United States Court of Appeals for the Eighth Circuit.

31. On May 17, 1993, the Eighth Circuit entered its decision in *McIntosh v. Pacific Holding Company,* 992 F.2d 882 (8th Cir), *cert. denied,* 510 U.S. 965, 114 S.Ct. 441, 126 L.Ed.2d 375 (1993). The Eighth Circuit reversed Judge Urbom's judgment in favor of Jean A. McIntosh, reasoning that the Plan's reimbursement provision entitled the Plan to all funds recovered from the third-party insurers. The Eighth Circuit's opinion also

vacated the attorney fee award to H & O. Jean A. McIntosh sought rehearing of that decision by the entire Eighth Circuit Court of Appeals. The Eighth Circuit denied the en banc hearing request on June 24, 1993. On July 23, 1993, the district court entered judgment in favor of PHC and the Plan, in accordance with the mandate of the Eighth Circuit.

32. Jean A. McIntosh petitioned the United States Supreme Court for a writ of certiorari from the decision of the United States Court of Appeals for the Eighth Circuit. On November 8, 1993, the United States Supreme Court denied McIntosh's petition for a writ of certiorari. 510 U.S. 965, 114 S.Ct. 441, 126 L.Ed.2d 375 (1993).[3]

33. Following the U.S. Supreme Court's denial of certiorari, H & O demanded that the Plan pay to it one-third of the escrowed insurance proceeds as an attorney fee under the "common fund" doctrine. The Plan requested that H & O provide to it detailed time and expense records showing the hours worked, hourly rates, and expenses incurred in connection with H & O's "common fund" claim. H & O took the position that it was entitled to one-third of the escrowed funds based on its contingent-fee contract with McIntosh, and that the detailed time and expense records were, therefore, irrelevant; nonetheless, H & O complied with the Plan's request and submitted a compilation of such records. A true and correct copy of the time and expense compilation submitted by H & O to the Plan is attached to the stipulation as *Exhibit "Y".*

34. PHC and the Plan were billed and paid the following amounts for legal work performed by members of the Cline, Williams, Wright, Johnson & Oldfather law firm, in connection with the Plan's asserted subrogation or reimbursement interest in McIntosh's recovery from the negligent driver:

December 20, 1988 through June 30, 1989
|  | |
|---|---|
| Fees: | $3,227.00 |
| Costs: | 47.24 |

Ex. 6.)

---

3. The escrowed funds were distributed to the Plan on or about December 11, 1993. (Filing 28,

June 30, 1989 through April 13, 1990

    Fees:     $2,498.40
    Costs:       85.89

April 14, 1990 through November 29, 1990

    Fees:     $1,421.00
    Costs:       59.33

December 1, 1990 through November 8, 1993

    Fees:     $32,728.00
    Costs:    2,876.78

December 1, 1993 through April 7, 1995

    Fees:     $2,605.50
    Costs:       72.63

35. H & O continuously maintained detailed time and expense records showing the hours worked, hourly rates, and expenses incurred in connection with H & O's representation of Jean A. McIntosh, individually and as conservator for Kristin K. McIntosh, in all proceedings had in the Eighth Circuit and in the United States Supreme Court, in the prior ERISA litigation, referenced in paragraphs 29–32 above. A true and correct copy of the time and expense records of H & O, reflecting attorney's fees and expenses incurred by H & O in connection with the appellate proceedings in the prior ERISA litigation, is attached to the stipulation as *Exhibit "Z"*.

## II. DISCUSSION

The basis of the claim asserted by the plaintiffs is the so-called "common fund" doctrine. (Filing 1 ¶ 27.) Plaintiffs claim that the "[the employer and the plan] have failed and refused and continue to fail and refuse to recognize the Plan's equitable obligation to pay its proportionate share of the expenses incurred, including attorney's fee, in the recovery of [the] common fund, solely through the efforts of [participant's attorneys]." (*Id.*)

In order to understand the specific issues raised by this case a general understanding of the doctrine and principles of the federal "common fund" theory is necessary. It is then necessary to examine the arguments of the defendants regarding lack of subject matter jurisdiction. And, finally, it is necessary to apply the general principles of the federal "common fund" doctrine to the undisputed facts of this case. I turn to those tasks next.

## A. COMMON FUND

I examine first what the "common fund" doctrine is, and then I examine what principles govern whether a party or a lawyer is entitled to fees under the theory.

### 1. The doctrine

The federal "common fund" doctrine is a variant of the axiom that equity will not allow "unjust enrichment". Federal Judicial Center, *Awarding Attorneys' Fees and Managing Fee Litigation* 51 (1994) [hereinafter *Awarding Attorneys' Fees*]. The doctrine provides that a court "may award fees from a common fund where a suit produces a recovery for persons other than the litigant...." *Id.* at 49. The "common fund" doctrine exists independently of the various fee shifting statutes. *Id.* The "common fund" doctrine is a part of the "historic equity jurisdiction of the federal courts."[4] *Sprague v. Ticonic Nat. Bank*, 307 U.S. 161, 164, 59 S.Ct. 777, 778–79, 83 L.Ed. 1184 (1939) (When a litigant on his own behalf and at his own expense has imposed a lien on earmarked funds in an insolvent bank and by so doing has incidentally benefited others who are not parties to the suit, allowance of counsel fees and related expenses to be paid out of the earmarked funds may be authorized by a federal court.) *See e.g., Boeing v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980) ("[A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his

---

4. For reasons more fully discussed later regarding this court's subject matter jurisdiction, federal common law principles regarding the "common fund" doctrine are to be applied rather than the law of any particular state. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987) (Congress anticipated the development of a federal common law of rights and obligations regarding ERISA regulated plans); *Mohamed v. Kerr*, 53 F.3d 911, 913 (8th Cir.) *cert. denied* — U.S. —, 116 S.Ct.

185, 133 L.Ed.2d 123 (1995) (same). Since there is no lack of federal common law on the "common fund" doctrine, it is inappropriate to look to the laws of the various states for guidance on the subject. *Reid v. Connecticut General Life Ins. Co.*, 17 F.3d 1092, 1098 (8th Cir.1994) (although a federal court may look to state law for guidance, "where there is no federal statutory law to apply in ERISA litigation, 'federal common law,' not state law, should be applied.").

client is entitled to a reasonable attorney's fee from the fund as a whole."); *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1881) (Where bonds are secured by trust fund which trustee is wasting, a holder of a portion of the bonds who, in good faith, succeeds in protecting the funds for the common benefit of the bond-holders, is entitled to be paid from the fund for his counsel fees); *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885) (Expanding the common fund doctrine earlier developed in *Greenough,* the Court held that the plaintiff's counsel not only had the right to seek reimbursement of fees for the client, but was also eligible for an award of his own (not limited to what the client owed the lawyer) to be paid from the common fund created by the litigation). *Cf. Hobbs v. McLean,* 117 U.S. 567, 581–82, 6 S.Ct. 870, 876–77, 29 L.Ed. 940 (1886) ("When many persons have a common interest in trust property or fund, and one of them, for the benefit of all and at his own cost and expense, brings a suit for its preservation or administration, the court of equity ... will order that the plaintiff be reimbursed his outlay from the property of the trust, or by proportional contribution from those who accept the benefits of his efforts.").

### 2. The principles which govern the doctrine

There are generally accepted federal principles which govern whether a party or a lawyer is entitled to reimbursement or payment of attorney fees from a "common fund" in a case brought in federal court.[5] *Awarding Attorneys' Fees,* at 52–63. I turn next to those general principles.

■ First, both the client and the lawyer may seek compensation for fees in an otherwise proper "common fund" case. *Compare Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 *with Greenough,* 105 U.S. 527, 26 L.Ed. 1157. The client may seek reimbursement for the fees he has paid or owes, and the lawyer may seek fees other than those paid

or owed by the client. *Awarding Attorneys' Fees* at 50–51. Indeed, one of the attributes of the "common fund" doctrine is that a lawyer may seek payment. *Skelton v. General Motors Corp.,* 860 F.2d 250, 253 (7th Cir.1988) *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989) ("Thus, in statutory fee-shifting cases, only parties (usually plaintiffs) may seek reimbursement whereas in common fund cases *attorneys* may seek compensation."). Consequently, there may be "claims by plaintiffs to have their legal costs shared and claims by attorneys for an award other than that paid or owed by the client." *Awarding Attorneys' Fees* at 50–51. Both types of claims are allowed because both types "prevent[ ] unjust enrichment of the beneficiaries." *Id.* at 51.

■ Second, although frequently asserted in class actions, application of the "common fund" doctrine "is not limited to class actions." *Awarding Attorneys' Fees* at 51. The Supreme Court has made this clear in *Sprague v. Ticonic Nat. Bank,* where the court held that the "absence of an avowed class" did not "touch the power of equity in doing justice as between a party and the beneficiaries of his litigation." 307 U.S. at 167, 59 S.Ct. at 780.

■ Third, in order for the "common fund" doctrine to be applied there must a "fund" out of which to make the reimbursement or payment of the attorney fee. *Awarding Attorneys' Fees* at 52. But this limitation "is not applied mechanically." *Id.* This requirement at bottom means that the "common fund" doctrine is not properly asserted where the burden of payment falls upon those who did not benefit from the litigation. *See e.g., Christensen v. Kiewit–Murdock Inv. Corp.,* 815 F.2d 206, 211 (2nd Cir.), *cert. denied,* 484 U.S. 908, 108 S.Ct. 250, 98 L.Ed.2d 209 (1987) (assuming tender offer would not have been made but for the suit, plaintiffs were not entitled to fees payable by defendant inasmuch as the award would be paid by the defendant that made the tender offer rather than against any

---

**5.** Because I find that plaintiffs are not entitled to fees, I have not tried to articulate the principles which govern how a fee should be calculated if a fee were due under the "common fund" doctrine. *See Awarding Attorneys' Fees,* at 63–73 (for the principles which govern the fee calculation issue).

"fund" created by the tender offer or those persons who had purportedly benefitted from the tender offer).

■ Fourth, there must be some type of causal connection between the litigation and a beneficiary's enjoyment of the fund; that is, the lawsuit must: (1) bring the fund about; (2) enhance the fund; or (3) create access to the fund. *Awarding Attorneys' Fees* at 53–54. Thus, in *Sprague v. Ticonic Nat. Bank* "common fund" fees were allowed in a case where an existing trust fund was put in danger when a bank became insolvent, and plaintiff's litigation established a lien which indirectly benefited all depositors. 307 U.S. at 166, 59 S.Ct. at 779–80.

■ Fifth, in order for the doctrine to apply there must in fact (1) be "bona fide beneficiaries" in addition to the plaintiff (2) who derive a benefit from the particular fund created, brought about or enhanced by the litigation. *Awarding Attorneys' Fees* at 55–56.

The first prong of this limitation may be illustrated by the following example: a successful stockholder's derivative suit by a minority stockholder against the directors of a corporation who constitute all remaining stockholders is not a proper case for a "common fund" award since the directors who paid the judgment to the corporation in fact were not benefitted by the litigation. *Id.* at 55 (citing *Junker v. Crory,* 650 F.2d 1349, 1352 (5th Cir.1981)).

The second prong of this limitation is illustrated this way: a lawyer who wins a point of law in one case is not entitled to fees each time some other party benefits from the precedent in a subsequent case if the second case is unrelated to the fund created by the first case. *Id.* at 56 (citing *Cranston v. Hardin,* 504 F.2d 566, 580 (2nd Cir.1974)).

■ Sixth, the payment of fees by the beneficiaries under the "common fund" doctrine "must result in costs being 'shifted with some exactitude to those benefitting.'" *Awarding Attorneys' Fees* at 57 (quoting *Alyeska Pipeline Service Co. v. Wilderness Soc'y,* 421 U.S. 240, 265 n. 39, 95 S.Ct. 1612, 1626 n. 39 (1975)). Basically this requirement means that the persons who will actually benefit from the litigation must be capable of ascertainment with some precision in order that the court may craft an order providing that other persons who are not actually benefitted or who are not actually benefitted to the same degree are insulated from the burden of paying all the fees or a disproportionate amount of the fees. *Id.* at 58 (footnote and citations omitted).

■ Seventh, in order for the doctrine to apply the court must have "control" of the fund. *Awarding Attorneys' Fees* at 59. This essentially pragmatic requirement "is generally satisfied by jurisdiction over a party that controls the fund, usually the defendant." *Id.* (footnote and citations omitted). Indeed the "absence of control, by itself, is rarely the basis for denial of a fee award." *Id.* (footnote and citations omitted).

■ Eighth, an award under the common fund doctrine is generally unwarranted where (1) Congress has expressly or impliedly stated that such awards are inappropriate; (2) the other beneficiaries of the plaintiff's suit had interests adverse to those of the plaintiff; or (3) the other beneficiaries to the fund were represented by counsel and did not take a " 'free ride' " on the work of the other lawyer. *Id.* at 60–63 (footnotes and citations omitted).

■ In summary, the "common fund" doctrine is founded upon the major premise that "such allowances are appropriate only in exceptional cases and for dominating reasons of justice." *Sprague v. Ticonic Nat. Bank,* 307 U.S. at 167, 59 S.Ct. at 780.

## B.  SUBJECT MATTER JURISDICTION

The defendants challenge this court's subject matter jurisdiction over this dispute. I am unpersuaded by their argument.

Plaintiffs have asserted three grounds upon which they base their claim of subject matter jurisdiction: (1) federal question jurisdiction under 28 U.S.C. § 1331; (2) diversity jurisdiction under 28 U.S.C. § 1332; and (3) ERISA jurisdiction under 29 U.S.C. § 1132.  (Filing 1 ¶ 4.)

Defendants primarily argue that ERISA jurisdiction under 29 U.S.C. § 1132 does not apply. They assert two reasons: (1) H & O is a stranger to the Plan and it therefore has no right to sue under the ERISA statute; and (2) McIntosh, although not a stranger to the Plan, has no right to sue under the ERISA statute because the relief she seeks is not authorized by the ERISA jurisdictional statute. I need not reach either of these arguments because this court has both federal question jurisdiction and diversity jurisdiction.

### 1. Federal question jurisdiction

▉▉▉▉ "Federal common law as articulated in rules that are fashioned by court decisions are 'laws' as that term is used in § 1331." *National Farmers Union Ins. Co. v. Crow Tribe of Indians,* 471 U.S. 845, 850, 105 S.Ct. 2447, 2450–51, 85 L.Ed.2d 818 (1985). *See also Illinois v. City of Milwaukee,* 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972). Therefore, a claim founded upon federal common law "arises under" federal law within the meaning of section 1331. *National Farmers Union Ins. Co. v. Crow Tribe of Indians,* 471 U.S. at 850–51, 105 S.Ct. at 2450–51 ("[A] 'suit arises under the law that creates the cause of action.' ") (quoting *American Well Works Co. v. Layne and Bowler Co.,* 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916)). For three closely related reasons I am convinced that Plaintiffs' claim under the "common fund" doctrine constitutes a claim under "federal common law" which in turn gives this court federal question jurisdiction.

As earlier noted, the "common fund" doctrine is a part of the "historic equity jurisdiction of the federal courts." *Sprague v. Ticonic Nat. Bank,* 307 U.S. at 164, 59 S.Ct. at 778–79. It therefore appears to be "federal common law" at the most elemental pre-*Erie* [6] level.

Still further, the "common fund" doctrine was made by federal judges in order to decide substantial but specialized questions having to do with the equitable handling of "common funds" by federal courts in situations in which the federal courts otherwise

had federal jurisdiction. It thus comports with post-*Erie* notions of "federal common law." *See e.g.,* 19 Wright, Miller, and Cooper, *Federal Practice and Procedure,* Jurisdiction § 4514 at 224 (1982) (among other categories, federal common law after *Erie* has been developed in those "situations in which Congress or the Constitution has not provided a rule of decision for the resolution of a federal question case that is properly within the subject matter jurisdiction of the federal courts.").

Most importantly, Plaintiffs' claim has a close relationship to a comprehensive federal regulatory scheme which provides no decisional rule, resolution of the question presented will have a significant and direct impact upon the regulated plan and a plan participant, and the claim originates from underlying federal litigation in which this court had federal jurisdiction. This is true because (i) Plaintiffs' "common fund" claim asserts an interest in a large portion of a fund (ii) that was in effect transferred to an ERISA regulated plan by a prior decision of a federal court (iii) asserting ERISA jurisdiction over the same fund and the same parties, *McIntosh v. Pacific Holding Company,* 992 F.2d 882 (awarding the fund at issue to the Plan based upon ERISA jurisdiction), and (iv) ERISA, a comprehensive federal regulatory scheme, provides no rule of decision.

The assertion that this court has federal question jurisdiction under section 1331 is strongly buttressed, if not controlled, by the Supreme Court's (unanimous) recognition that in cases dealing with a plan governed by ERISA it will frequently be necessary to develop federal common law rules to fill in the spaces left by Congress. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. at 56, 107 S.Ct. at 1557–58 (there were Congressional "expectations that a federal common law of rights and obligations under ERISA-regulated plans would develop. . . ."). Thus, cases involving a dispute about entitlement to attorney fees payable from a fund controlled by an ERISA regulated plan, where the plan gained control of the fund by virtue of an underlying federal court order premised upon ERISA jurisdic-

---

6. *Erie Railroad Company v. Tompkins,* 304 U.S.    64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

tion, are appropriate disputes for "the federal courts [to] supply the necessary rule of decision by pronouncing common law *to fill the interstices of a pervasively federal framework.*" 19 Wright, Miller, and Cooper, *Federal Practice and Procedure*, Jurisdiction § 4514 at 224 (footnote omitted) (emphasis added).[7]

Indeed, in a case which is nearly a mirror image of this one, the Ninth Circuit, in an opinion authored by Judge Lay (sitting by designation), formulated a federal common law rule to insulate a plan participant's lawyer from having to reimburse the plan for the fees he was actually paid regarding the proceeds of litigation in which the plan had a subrogation interest. *Hotel Employees & Restaurant Employees Int'l Union Welfare Fund v. Gentner,* 50 F.3d 719, 721 (9th Cir. 1995) (adopting federal common law rule that ERISA beneficiary's attorney is not bound to terms of client's subrogation agreement to which attorney is not signatory). *See Southern Council of Industrial Workers v. Ford,* 83 F.3d 966, 968–69 (8th Cir., 1996) (citing *Gentner* with approval, indicating that *Gentner* established a federal common law rule applicable to cases involving ERISA regulated plans, and holding that the district court erred by dismissing the case for lack of subject matter jurisdiction).

I therefore find and conclude that this court has federal question jurisdiction as Plaintiffs' claim "arises under" federal common law.[8]

### 2. Diversity jurisdiction

I also believe that this court has diversity jurisdiction under 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties. (Filing 27, Ex. 8 ¶¶ 1–3)

(the citizenship of plaintiffs is Nebraska; PHC, individually and as plan administrator, has its principal place of business in California); (Filing 27, Ex. 8, attached Ex. A) (signature page of plan document) (the Plan was created and is administered in California.) Moreover, the amount actually in controversy exceeds the required jurisdictional amount of $50,000 as the attorney fee claimed by H & O is roughly 31.5 percent of the common fund of $250,500 or about $79,000. (Filing 1 ¶¶ 27–29; Filing 27, Ex 8, attached Ex. B.)

In finding that the court also has diversity jurisdiction, I nevertheless observe that "Federal common law, when it exists, controls in federal court even in diversity cases...." 13B Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, *Federal Practice and Procedure*, Jurisdiction 2d § 3563 at 60 & n. 36 (1984) (citing *Bank of America Nat. Trust & Savs. Assn. v. Parnell,* 352 U.S. 29, 33–34, 77 S.Ct. 119, 121–22, 1 L.Ed.2d 93) (1956) (in a diversity suit between private parties involving the alleged conversion of government bonds the decision with respect to whether the bonds were "overdue" was a matter of federal law but whether the defendants acted in "good faith" was a matter of state law). Thus, the ancillary finding of diversity jurisdiction does not contradict this court's proper reliance upon federal common law for purposes of resolution of the merits of this case.

### C. MERITS

I turn to the merits of Plaintiffs' "common fund" claim. One argument in particular convinces me that Plaintiffs are not entitled to relief. Defendants assert that it is inappropriate to award attorney fees from

---

7. This latter distinction—the close relationship of this case to the prior federal litigation over entitlement to the common fund upon which a federal court had ERISA jurisdiction over the same parties—distinguishes this case from *Ryan by Capria–Ryan v. Federal Express Corp.,* 78 F.3d 123, 127–28 (3rd Cir.1996). In *Ryan* the Third Circuit refused to adopt a federal common law claim of unjust enrichment when a plan participant sued the plan for a pro rata portion of the plan participant's attorney fees arising from settlement of a malpractice action. In *Ryan* there was no prior federal litigation over entitlement to the common fund at issue upon which a federal court had ERISA jurisdiction over the same parties.

8. Because this case is so closely tied to the earlier ERISA litigation a question arises as to whether Plaintiffs are barred from asserting their "common fund" claim in this case because of claim or issue preclusion defenses that might exist given the adverse ruling in *McIntosh v. Pacific Holding Company,* 992 F.2d 882. Since this question involves an affirmative defense that was not briefed or argued I have not addressed it.

the common fund because the interests of the beneficiaries who will bear the burden of the fees were adverse to Plaintiffs, and Plaintiffs tried to take the common fund from the Defendants thus requiring Defendants to incur substantial attorney fees.

Certain undisputed facts are especially material to this persuasive argument. Initially, while Plaintiffs and Defendants had similar interests in recovering the $250,500 which forms the body of the fund, Plaintiffs before and after the $250,500 was recovered consistently maintained that Defendants had no entitlement to the money. As a result of Plaintiffs' position Defendants hired lawyers before the fund was recovered and thereafter expended more than $45,000 in attorney fees and expenses monitoring the litigation which recovered the fund and protecting the interests of the Plan from the claims of McIntosh. Although asserted in good faith, Plaintiffs' legal position that the Plan had no right to the money was incorrect as a matter of law as the Court of Appeals made clear in *McIntosh v. Pacific Holding Company*, 992 F.2d 882, a suit brought by Plaintiffs.

The federal courts have historically refused to make a "common fund" award when the interests of the beneficiaries who will bear the burden of the fees was adverse to Plaintiffs, particularly when Plaintiffs unsuccessfully tried to take the common fund from the beneficiaries who were ultimately entitled to the fund. *See e.g., Hobbs v. McLean,* 117 U.S. at 582, 6 S.Ct. at 877 (where a representative of one partner collected funds owed a partnership and then unsuccessfully litigated with the remaining partners over the sum so collected, the Court held "where one brings adversary proceedings to take possession of trust property from those entitled to it, in order that he may distribute it to those who claim adversely, and fails in his purpose, it has never been held, in any case brought to our notice, that such person had any right to demand reimbursement of his expenses out the trust fund, or contribution from those whose property he sought to misappropriate."); *United States v. Tobias,* 935 F.2d at 668–69 (where original defendant in a land condemnation action was joined in the action by intervenor and the main case was ulti-

mately settled with the funds being paid into court and where the original defendant unsuccessfully litigated against the intervenor regarding entitlement to the entire proceeds of the condemnation award, the court held that the original defendant could "not recover and try to monopolize a fund, but then, failing in the attempt, declare it a 'common fund' and obtain his expenses from those whose rightful share of the fund he sought to appropriate.").

As the court said in *Tobias:* "At bottom, the 'common fund' doctrine is simply an exercise in equity. We think that making [the party entitled to the fund] pay a cent to defray the expenses of a party who fought to keep [the prevailing party] from having anything from the supposed fund is inequitable." *Id.* at 669. And, like *Tobias,* there are at least three factors in this case which support the conclusion that equity would not be served by taxing the common fund with Plaintiffs' fees.

First, if the common fund were taxed as the Plaintiffs propose the Defendants would be required to pay not only their fees in protecting and preserving the fund for their lawful use, but they would also be required to pay the fees of a party who asserted a legally incorrect position. Thus, a decision in favor of the Plaintiffs would unjustly shift the risks inherent in Plaintiffs' decision to litigate about ownership of the fund to the Defendants notwithstanding the fact that Defendants prevailed in the underlying ERISA litigation. There is no compelling equitable reason to require the party justly entitled to the fund to pay both his or her fees and those of his or her opponent simply because there is a pot of money from which the payment can be made.

Second, a decision in favor of the Plaintiffs would create an economic incentive for parties to litigate over "common funds" irrespective of the merits of their claim to the fund. This is true because under the Plaintiffs' theory the loser would not suffer the full economic consequences of his or her decision to litigate because the loser would always be entitled to something from the common fund.

Third, if Plaintiffs position was adopted other innocent plan participants, who are not

parties to this litigation and who depend upon the Plan to meet their health care needs, would be adversely impacted. This conclusion follows because the net result of an award to Plaintiffs would be to reduce the assets of the Plan by not only the fees awarded to Plaintiffs but also by the defense fees *unnecessarily* generated by Plaintiffs legally incorrect position asserted against the Plan. Equity is not served when innocent parties suffer the consequences of someone else's incorrect legal strategy.

Plaintiffs are not without some plausible equitable arguments of their own. Ultimately, however, I find all such arguments unpersuasive. I address only those arguments which merit a response.

Plaintiffs initially suggest that but for their actions there would not have been any fund. They also add that the Defendants' lawyers did nothing to help create the fund. From these points Plaintiffs argue that it is inequitable to deny them fees. Assuming the factual premise of their argument is true, I am still not persuaded by their conclusion that equity will be undone if Plaintiffs are denied fees.

Someone is going to have to bear the economic consequences of Plaintiffs' unsuccessful decision to litigate over entitlement to the fund. There are only two possible outcomes: (1) the fund can be taxed to pay both Plaintiffs' fees and Defendants' fees; or (2) the fund can be taxed to pay Defendants' fees, and Plaintiffs must absorb their own fees.

The only way to choose which of the two alternatives is "equitable" is to ask what should have happened if Plaintiffs had followed the correct legal path and paid the money to the fund. In that circumstance, the Plan would have received the. $250,500 proceeds of the tort litigation, and would not

have been required to pay its own lawyers over $45,000. In that case the Defendants would be obligated to pay the fees that generated the fund because everything else being equal the Plan would be unjustly enriched if it got something for nothing.[9] But the maximum cost to the Plan in such an event would be the fees of Plaintiffs; that is, the Plan would not be required to pay the fees of Plaintiffs *and* the defense fees. Why should the innocent Defendants (and their constituent health plan participants) now be required to pay two sets of lawyers because the Plaintiffs guessed wrong? The question supplies the answer.

I recognize that during settlement negotiations there was a discussion about whether the Plan would pay McIntosh's attorneys fees *if* Plaintiffs agreed to honor the Plan's reimbursement rights. (Pt. I, finding 25.) The Defendants denied any liability for such fees. (*Id.*) Defendants' refusal to acknowledge its obligation to pay fees *if* Plaintiffs acknowledged their obligation to honor the reimbursement provisions of the Plan is irrelevant to any equitable issue before me.

This discussion took place *after* Plaintiffs had first wrongly (in retrospect) and unequivocally denied the Plan's reimbursement claim. (*Compare* Pt. I, findings 12–16 *with* Pt. I, findings 17 and 25). Thus, by the time any discussion took place about honoring the reimbursement provisions of the plan in exchange for payment of McIntosh's attorney fees, the Defendants had already been forced to expend attorney fees of their own to defend their right to the fund. Hence, as this opinion makes clear, Defendants were not obligated to shoulder the burden of McIntosh's fees and their own fees as well.

Plaintiffs might alternatively argue that there is some positive net incremental difference between the value of their legal services

---

**9.** This opinion is not universally shared. *See Ryan by Capria–Ryan v. Federal Express Corp.*, 78 F.3d at 127–28 (in a case where a plan participant settled a malpractice case and sued to require the plan to pay a pro rata portion of the attorney fees in an effort to avoid a subrogation provision, the Third Circuit, finding for the Plan, observed in dicta that: "Indeed, it would be inequitable to permit the Ryans to partake of the benefits of the Plan and then, after they had

received a substantial settlement, invoke common law principles to establish a legal justification for their refusal to satisfy their end of the bargain."). I do not agree with *Ryan* to the extent that *Ryan* suggests that a plan can never be unjustly enriched and hence required to pay a fair share of attorney fees regarding the production of a "common fund" simply because a plan participant accepts the benefits of the plan.

and the cost of the defense services such that the fund should pay the difference. For example, Plaintiffs might argue that if it is worth $10.00 to produce the fund and if the defense costs are $5.00 then the Plan should pay Plaintiffs the difference of $5.00 because the Plan would have had to pay $10.00 in any event to obtain the "common fund" through some other lawyer.[10]

The answer to this argument is that it is not possible given the size of the fees generated in this case by both parties and the complexities of the legal issues involved to make an accurate calculation of the "net" value, if any, of Plaintiffs' services to the Plan (and its members). This is particularly true given the fact that the underlying tortfeasor's insurance carrier admitted liability early and was prepared to tender the entire insurance proceeds without litigation. Defendants have a strong argument that the fees sought by Plaintiffs provided no "net" benefit since the Plan's defense fees of over $45,000 substantially exceeded what the Plan would have been required to pay to produce the fund through the efforts of another lawyer.

Indeed the itemized bill for the tort litigation submitted by Plaintiffs, expressed as a function of hourly rates, indicated that the total fees and expenses (including some work in opposing the Defendants' claim) came to $34,944.54. (Pt. I, finding 33 and Ex. Y.) The point is this: if the Plan could have gotten the fund for $34,944.54[11] (as measured by the efforts of the Plaintiffs) but it was required to pay over $45,000 to defend itself regarding a legally insufficient claim (brought by the Plaintiffs), equity is not served by requiring the Plan to pay both bills.

As the Supreme Court has cautioned, an order requiring the payment of fees by the beneficiaries of a "common fund" should result in costs being "shifted with some exactitude to those benefitting." *Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 265 n. 39, 95 S.Ct. 1612, 1626 n. 39, 44 L.Ed.2d 141 (1975). Because of the conduct of the Plaintiffs, costs cannot be shifted with "some exactitude to those benefitting" in this case.

Plaintiffs argue that the Defendants could have sought attorney fees in the underlying ERISA action and therefore I ought not to consider the defense fees in this case. This argument fails for a variety of reasons not the least of which is that Defendants were not in any way legally obligated to seek such fees. Moreover, from a purely equitable point of view, the fact that Defendants treated Ms. McIntosh gently in the underlying ERISA litigation is no reason to impose an unfair result upon them in this action.

Plaintiffs further argue that if I rule in favor of the Defendants other plan participants in other cases will not hire lawyers to pursue valid claims against third parties in cases where the proceeds are likely to go to the ERISA regulated plan. I do not agree that such a result is a likely consequence of this opinion, but even if it were such a consequence it is no reason to treat Defendants inequitably in this case.

Finally, there is an indirect suggestion in Plaintiffs' brief that if I do not award fees to Plaintiffs Ms. McIntosh may have to pay her lawyers as if she received the $250,500, and the Plan received nothing. While I doubt that the fee agreement in this case could ever be construed in such a manner, even if I assume that to be the case there is no equitable reason to shift the costs to the Defendants because Ms. McIntosh entered into an agreement with her lawyers. Certainly the Defendants had nothing whatever to do with Ms. McIntosh's decision to contract with her

---

**10.** But if the Plan could have hired another lawyer to produce the fund for $4.00, and the Plan paid its lawyers $5.00 for unnecessary defense fees regarding its right to the fund, then the Plan is injured if it has to pay Plaintiffs anything.

**11.** I agree with Defendants that the contingent fee agreement does not establish the fair value of the legal services for, among other reasons, the Plan was not a party to the agreement and the "lodestar" method of calculating fees ought to be followed. *City of Burlington v. Dague*, 505 U.S. 557, 561–63, 112 S.Ct. 2638, 2641–42, 120 L.Ed.2d 449 (1992) (there is a "strong presumption" that the "lodestar" represents the reasonable fee, and "an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar.").

lawyers, and Defendants should not be expected to insure her against a bad decision.

In summary, the "federal common law" regarding the "common fund" doctrine stands squarely behind Defendants. Without intending any criticism of the apparently well-intentioned Ms. McIntosh and her able lawyers, they "rolled the dice" and must suffer the consequences of their gamble.

IT IS ORDERED that:

1. Plaintiffs' motion for summary judgment (filing 19) is denied;

2. Defendants' motion for summary judgment (filing 22) is granted;

3. Judgment shall be entered by separate document providing in substance that: "JUDGMENT is entered for Defendants and against Plaintiffs providing that Plaintiffs shall take nothing and this case is dismissed with prejudice."