HARRIS TRUST AND SAVINGS BANK, as former Trustee of the Sperry Master Retirement Trust No. 2 (and its successor, the Unisys Master Trust), and the Bank of New York, as Trustee of the Unisys Master Trust, Plaintiffs,

v.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Defendant.

John Hancock Mutual Life Insurance Company, Third–Party Plaintiff,

v.

Chase Manhattan Bank, N.A., Counterclaim Defendant,

and

Sperry Corporation And The Retirement Committee Of Sperry Corporation, Third–Party Defendants.

No. 83 CIV. 5401(DC).

United States District Court, S.D. New York.

March 30, 2001.

Anderson Kill & Olick, P.C. by Lawrence Kill, John B. Berringer, Ann V. Kramer, New York City, for Plaintiffs, Counterclaim Defendant, and Third–Party Defendants.

Reboul, MacMurray, Hewitt, Maynard & Kristol by Howard G. Kristol, Robert M. Peak, Stephen D. Houck, Joshua Gillette, Michele Cerezo–Natal, New York City, for Defendant and Third–Party Plaintiff.

### MEMORANDUM DECISION

CHIN, District Judge.

On November 22, 2000, I issued an Opinion in this case finding that defendant and third-party plaintiff John Hancock Mutual Life Insurance Co. ("Hancock") had breached its fiduciary duties to the Sperry Rand Master Retirement Trust No. 2 (and its successor, the Unisys Master Trust) (together, the "Trust") under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.* *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 122 F.Supp.2d 444 (S.D.N.Y.2000).

In the Opinion, I directed plaintiffs to submit a proposed judgment together with an affidavit setting forth interest calculations as well as an application for attorneys' fees and costs. 122 F.Supp.2d at 466. In this seemingly never-ending case, that direction triggered the filing of four proposed judgments, a set of objections to the first proposed judgment together with a response thereto as well as a surreply, two motions for an order amending the Court's findings of fact, six memoranda of law, *twenty* affidavits (or declarations), numerous exhibits, and a request by Hancock for the appointment of a special master or magistrate judge to conduct further proceedings in this seventeen-year old case.

The following issues are presented: (1) the amount of damages awarded for Hancock's failure to release excess funds; (2) prejudgment interest on the award of damages for Hancock's failure to release excess funds; (3) the amount of damages awarded with respect to the allocation and excess risk charge claims; (4) prejudgment interest on the damages awarded with respect to the allocation and excess risk charge claims; (5) the amount to be awarded for attorneys' fees; (6) the amount to be awarded for costs, including expert witness fees; (7) prejudgment interest on any award of attorneys' fees and costs; and (8) equitable relief. I address each issue in turn.

## 1. *Damages for Failure to Release Excess Funds*

In the Opinion, I awarded damages to the Trust for Hancock's failure to release excess funds based on Professor Ibbotson's use of the actual overall Sperry Trust case rate. Hancock argues that was error because Professor Ibbotson should have used the "new money" rate rather than the case rate. Hancock further argues that "[i]n the end," Professor Ibbotson, Mr. Annin, and Dr. Babbel (Hancock's expert) "agreed that the proper measure of what the rollout amounts earned in GAC 50 was the new money rate." (Def. Mem. in Supp. of Mot. to Am. Findings of Fact at 6).

Hancock's argument is disingenuous and is based on a mischaracterization of the testimony. Mr. Annin did not testify "[i]n the end" that the proper measure was the new money rate. Rather, Mr. Annin testified solely as a rebuttal witness to lay a foundation for the admission of a chart that provided an alternative theory of damages that the Trust was relying on only if Dr. Babble's analysis were accepted. (*See* Tr. at 1830, 1834, 1905, 1908, 1913, 1916, 1927–28). During Mr. Annin's testimony, the following exchange occurred:

MS. KRAMER: … He was instructed to run this model based on the admissions made by Dr. Babbel during his testimony.

MR. PEAK: Yes, and I would like to know how it corrects for something Dr. Babbel said.

THE COURT: Tell me what the instructions were with respect to these last two pages.

THE WITNESS: I really have no qualifications as to liabilities. We were told to calculate the model using this new liability stream.

Q. So you are not here to testify as to the quantum of liability. All you are doing for us is the math.

A. That's correct.

(Tr. at 1927–28). In fact, as I did not accept Dr. Babbel's analysis, Mr. Annin's testimony as well as Exhibit 1280 are irrelevant. Likewise, Professor Ibbotson did not admit any error in his analysis and he did not adopt Dr. Babbel's analysis. (*See, e.g.*, Tr. at 1189–90).

This aspect of Hancock's motion for an order amending the Court's findings of fact is denied.

### 2. Interest on Damages for Failure to Release Funds

Hancock objects to the use of the Sperry Trust rate of return to calculate prejudgment interest on damages for Hancock's failure to release funds for the period after July 1, 1997 on the technical grounds that the Trust did not submit "any admissible, competent evidence with respect to the [Trust's] rate of return for that time period." (Def. Obj. at 24).[1] The objection is overruled. The Opinion did not direct the Trust to submit such documentation and I am satisfied that Mr. Annin had sufficient information to make the calculations. Moreover, in response to Hancock's objection, the Trust has now submitted the documentation.

### 3. Damages for Allocation/Excess Risk Charge Claims

The parties apparently agree that the award of $5,724,528 in damages for the allocation and excess risk charge claims should be reduced because the Court's denial of the scaling claim affected the damages calculations. The parties' motions for an order amending the Court's findings of fact are granted to the extent that the damages awarded with respect to the allocation and excess rick charge claim are reduced to $5,696,400.

### 4. Interest on Damages for Allocation/Excess Risk Charge Claims

■ The prejudgment interest on the damages awarded for the allocation and excess risk charge claims must be reduced

to account for the reduction in the damages. More significantly, the Trust proposes using the Sperry Trust rate of return, while Hancock objects on the grounds that the use of such a rate would be "inconsistent with the methodology employed by the Trust's expert at trial." (Def. Obj. at 22). In particular, Hancock argues that because the Trust's expert (Daniel McCarthy) calculated damages on these claims using the "investment generation method," interest should be calculated using that rate rather than the overall Sperry Trust rate of return. (Id.).

The objection is overruled. McCarthy calculated the amount of excess risk charges and mis-allocated income and expenses. That amount would have constituted excess or free funds no different from the other free funds. The Trust could have invested these additional excess funds elsewhere and it is reasonable to assume that these funds would have earned the overall Sperry Trust rate of return.

Prejudgment interest on damages for the allocation and excess risk charge claims is to be calculated using the overall Sperry Trust rate of return.

### 5. Attorneys' Fees

The Trust seeks attorneys' fees for work performed by Anderson Kill & Olick, P.C. ("AKO") in the amount of $6,700,405.10, which reflects a deduction for the omission of certain invoices altogether and 20% discounts on certain other invoices. (See 12/13/00 Kill Aff. ¶¶ 6, 7, 8 & Ex. A).[2] In addition, the Trust seeks reimbursement for legal work performed by four other law firms, as follows: (1) Johnson & Gibbs, $65,452.11; (2) Johnson & Worthy,

---

1. "Def. Obj." refers to defendant's "Objections to Plaintiff's Proposed Final Judgment."

2. A second exhibit reports the total as $6,700,425.10—$20 more. (12/13/00 Kill Aff., Ex. B). I will use the smaller number.

$3,453.71; (3) Kilpatrick & Cody, $41,724.88; and (4) Ivins, Phillips & Barker, $10,377.50. (12/13/00 Kill Aff. ¶¶ 8, 27 & Ex. F). The total for the five law firms is $6,821,413.3. Finally, the Trust seeks reimbursement of $969,390.29 paid to AKO by an insurance company on behalf of the Sperry Retirement Committee (the "SRC"), with the proviso that any sums awarded in this respect will be returned to the insurer as subrogee of the SRC.

Hancock objects to the requested fees on a number of grounds, including: (a) the Trust "appears to have improperly sought" fees for non-ERISA claims on which it did not prevail; (b) the Trust has not provided contemporaneous time records; (c) the Trust's attorneys have not described the work with sufficient specificity; (d) the Trust seeks reimbursements for work done by its lawyers that was "excessive, redundant or not otherwise compensable"; (e) the Trust is not entitled to recover fees paid by an insurance company to AKO on behalf of the SRC; and (f) the Trust seeks attorneys' fees for which the Trust was not ultimately responsible. (Def. Obj. at 6–11). Hancock requests, *inter alia,* that the Court order the Trust to produce contemporaneous time sheets now and that the Court appoint a special master or magistrate judge to review the attorneys' fee application.

## A. *AKO*

Hancock correctly notes that the Trust did not submit contemporaneous time records, but I did not direct the Trust to do so. Rather, I directed the Trust to:

> submit an application for attorneys' fees and costs, in the nature of a lodestar computation, *i.e.,* providing brief descriptions of work performed and reporting the hours billed and hourly rates charged per attorney.

122 F.Supp.2d at 466. The Trust has done as I requested.

The Trust has provided, for AKO's services, a monthly summary of the time expended by attorneys and paralegals, drawing the information from invoices and other contemporaneous records and providing each timekeeper's hourly rate and number of hours together with a brief description of the work performed. (12/13/00 Kill Aff., Ex. A). I accept Mr. Kill's representation that AKO "has maintained and has possession of daily contemporaneous time records as well as records reflecting expenses as they were incurred in this action from 1984 to the present which form the basis of the [Trust]'s request for an award of attorneys fees and expenses." (2/5/01 Kill Sur–Reply Aff. ¶ 3). The monthly summaries start with the 2/16/84 invoice and continue through the 12/13/00 invoice—a total of more than seventeen years. AKO has also provided another summary sorted by timekeeper, showing the number of hours billed and the average hourly rate charged by each person. (12/13/00 Kill Aff., Ex. B). These materials, together with Mr. Kill's supporting affidavits and my own experience in the law, both as a judge and as a lawyer, are sufficient to permit me to evaluate the Trust's application with respect to fees for AKO; I do not need to review seventeen years worth of time sheets. *See Cruz v. Local Union No. 3, IBEW,* 34 F.3d 1148, 1160 (2d Cir.1994) (typed summaries of hours drawn from contemporaneous time records, without submission of actual time records, was sufficient to support attorneys' fees application).

The amount of fees requested for AKO's services is high—$6,700,405.10—but this is an extraordinary case and the Trust is entitled to a substantial attorneys' fee award. The case has been pending since

1983, seventeen years, and it has been hard-fought all the way. The stakes were significant, and the case involved complex issues of law and fact, as well as difficult and complicated accounting and insurance concepts. The case reached not only the Second Circuit but also the Supreme Court of the United States. Discovery was voluminous, as hundreds of thousands of documents were produced and both sides propounded several sets of interrogatories. The contract at issue—GAC 50—was entered into in 1941 and thus facts spanning five decades were at issue. Some fifty-one depositions were taken, over approximately ninety-six days. During discovery several motions to compel were filed, and there were also substantive motions as well—dispositive motions and motions in limine. A voluminous pretrial order was prepared and thousands of exhibits were marked and prepared for trial.[3] The parties submitted lengthy briefs and proposed findings of fact and conclusions of law prior to trial. The trial itself took thirteen days. (*See* 12/13/00 Kill Aff. ¶¶ 10–26 & Ex. E). Hancock's post-trial brief was 184 pages; the Trust's post-trial brief was 139 pages. In the end, the Trust and its attorneys achieved a substantial victory, as a judgment of some $20 million—before interest—will be entered.

I address some of Hancock's specific objections.

■ Hancock contends that because I presided over the case only since 1997 (after discovery had been completed), I "necessarily lack[ ] personal familiarity with the entire record." (Def. Obj. at 5). Hancock therefore asks me to refer the matter to a special master or magistrate judge. The request is denied. Although it is true that I do not have "personal famil-

iarity with the entire record," I do have extensive first-hand knowledge of perhaps the most significant parts of the case. I presided over the final preparations for trial, which included motions in limine, as well as the trial itself. Thus I have first-hand knowledge of the quality of the attorneys' work. I also became fully familiar with the legal and factual issues involved in the case, and by necessity I thereby became familiar with counsel's work over the course of virtually the entire case. I am certainly in a far better position than any special master or magistrate judge (who would have *no* personal familiarity with any part of the record) to evaluate the extent and quality of AKO's work. Appointment of a special master or magistrate judge, who would then have to review an attorneys' fee application covering some seventeen years worth of work, would only substantially delay the matter even further.

Hancock contends that the number of hours for which fees are requested is excessive because the Trust purportedly has failed to provide support for its claim that it excluded fees for the non-ERISA claims, *i.e.*, the Trust's unsuccessful contract and common law claims. The contention is rejected. In fact, the Trust has not sought any fees for the period from February 1990 through April 1991, during which most of AKO's work was performed in connection with Hancock's successful dispositive motion for summary judgment dismissing the non-ERISA claims. The amount of those excluded fees and costs—for which the Trust is not seeking reimbursement—is $695,434.22. (*See* 12/13/00 Kill Aff. ¶ 21). In addition, the Trust has reduced its invoices for the periods of January and February 1990 and August 1991

---

**3.** In the pretrial order, Hancock listed 2,980 exhibits and designated the testimony of 20 deposition witnesses. The Trust listed 1,280 documents and designated the testimony of 21 deposition witnesses. (1/15/01 Kill Reply Aff. ¶ 3).

through July 1992 by 20% to account for non-ERISA work. (*Id.* ¶ 22). These reductions are sufficient to account for the non-reimbursable non-ERISA work.

Hancock also contends that the Trust seeks reimbursement for an excessive number of hours because 134 AKO attorneys and paralegals worked on the case and AKO has not broken out travel time, for which a reduced rate is usually allowed. As for the number of attorneys and paralegals, it is not surprising that there was a great deal of turnover during the course of seventeen years. The bulk of the work, however, was performed by three partners, one of whom was on the case from the inception and the other two of whom were assigned in 1986 and 1987, respectively. The three lawyers account for some 65% of the total attorney time on the case. When four other attorneys are included—two of whom were involved in discovery early on and two of whom assisted at trial—more than 85% of the attorney time is accounted for. (1/15/01 Kill Reply Aff. ¶ 6). As to travel time, it is clear that the travel was justified, as Hancock produced documents in Boston, certain depositions were taken in Boston, and conferences and other meetings (including oral argument in the Supreme Court) were held in Washington, D.C. Although these objections are largely without merit, I will nonetheless reduce the fees awarded by 5% to account for any excesses in these respects.

Finally, Hancock does not appear to challenge the hourly rates charged by AKO. In any event, I find that the rates are fair and reasonable. The fee application uses historical rates, that is, the rates actually used when the invoices were sent to the client over the years. For example, Mr. Kill was billed at the hourly rate of $210 in 1984; the rate increased to $215 in March 1985; to $220 in February 1986; to

$250 in February 1987; and so on until it reached $395 in February 1997, $475 in December 1999, and $500 in December 2000. (12/13/00 Kill Aff., Ex. A). His average hourly rate charged for his 7,213.05 hours of work performed from 1984 through 2000 was $301.50. (*Id.*, Ex. B). In this extremely complicated and difficult case, the work of Mr. Kill and his colleagues was superb. Based on my first-hand observations in the case, my review of the entire record, my knowledge of rates charged by comparable law firms in New York City for comparable services, and the experience and credentials of Mr. Kill and his colleagues, I conclude that the rates charged by AKO were fair and reasonable. *See also Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 978 F.Supp. 589, 601 (D.N.J.1997) (magistrate judge's finding that AKO's rates were reasonable).

The reasonableness of AKO's fees is also demonstrated by the fact that the Trust actually paid the fees as they were incurred. AKO billed the Trust at its usual rates, and the Trust—a sophisticated client in an arms-length relationship with the firm—paid more than $7 million in invoices for fees and costs over the years.

Accordingly, I will award the Trust attorneys' fees in the amount of $6,365,384.85 for AKO's work. This figure represents a reduction of 5% from the requested fees of $6,700,405.10.

**B.** *The Other Law Firms*

█ The Trust seeks reimbursement of fees and costs for four other law firms as follows: Johnson & Gibbs, $65,452.11; (2) Johnson & Worthy, $3,453.71; (3) Kilpatrick & Cody, $41,724.88; and (4) Ivins, Phillips & Barker, $10,377.50. This aspect of the application is denied, for the Trust has not provided information similar to that provided for AKO. I do not have

information as to number of hours spent or rates charged by these law firms, nor did any of these lawyers make an appearance in this case, nor am I familiar with the quality or extent of their work. All I have are the dates and amounts of the invoices. Even assuming their services were helpful, I have no basis for evaluating the reasonableness of the fees charged or costs incurred.

### C. *Fees Paid by the Insurer*

■ Likewise, the Trust's request for an award of $969,390.29 in fees and costs as reimbursement for amounts paid by an insurance company to AKO on behalf of the SRC is denied, for the record does not contain sufficient information for me to make an evaluation of the reasonableness of the fees and costs in question. Although I do know that AKO was involved, I do not know what services were provided. More significantly, in my Opinion I awarded attorneys' fees to the Trust, not to the SRC. The considerations bearing on the issue of whether the SRC should be awarded attorneys' fees for successfully defending against the claims asserted against it by Hancock are different from the considerations bearing on the issue of whether the Trust is entitled to attorneys' fees for succeeding on its claims against Hancock.

### 6. *Costs*

The Trust seeks to recover its costs incurred in connection with this litigation. The costs fall into two broad categories: (a) $966,786.78 in AKO expenses billed to the Trust (12/13/00 Kill Aff. ¶ 6 & Exs. C, D); and (b) $712,594.74 in expenses paid directly by the Trust for experts. (*Id.* ¶ 27 & Ex. F).[4]

### A. *AKO Expenses*

■ The Trust seeks reimbursement for $966,786.78 in expenses incurred by AKO. These are broken down on a monthly basis as well as by category. (12/13/00 Kill Aff., Exs. C, D). The largest categories are "Outside Professional Services," or "Experts and temporary help," $438,288.94; photocopying, $169,147.86 and $29,823.51; transcripts and depositions, $109,010.18; and Lexis, $94,595.56. (*Id.*, Ex. D). Also included is $21,056.29 for "Other." (*Id.*).

I will not allow the $438,288.94 requested for "Outside Professional Services." The Trust has not made an effort to identify what these "Experts and temporary help" were. To the extent they were experts such as actuaries and economists, for the reasons set forth below, these costs are not recoverable. To the extent they were temporary legal help, the record does not permit me to evaluate the reasonableness of what they were paid: I do not know who they were, what their credentials were, or even what they did.

Nor will I allow the requested amount of $21,056.29 for "Other." In view of the many other specific categories, and without any description whatsoever, I have no basis for evaluating the reasonableness of this requested expense.

The other objections are overruled. Although Hancock is correct that some of these expenses would not fall under the rubric of "taxable costs," these are the types of expenses that are recoverable as part of an attorneys' fee application. *See, e.g., United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt–Meridian Constr. Corp.,* 95 F.3d 153, 173 (2d Cir. 1996) (allowing computer research expense

---

4. Exhibit F summarizes the costs paid by the Trust directly to experts, consultants, and other law firms. I have deducted the amounts

paid to the law firms, as these expenses are discussed above.

as part of application for attorneys' fees). I find that the expenses are fair and reasonable and were necessarily incurred. The photocopying figures, for example, are extremely high, but this was a document intensive case, with documents dating back more than fifty years. Thousands of exhibits were marked and used during depositions and at trial. The computer legal research charges are also reasonable; there were many difficult issues of law that required extensive research. Briefs were written not only for this Court but also for the Second Circuit and the Supreme Court. The transcripts, including daily copy of the trial testimony, were necessary. At trial both sides offered deposition transcripts that literally filled boxes. The daily trial transcripts were used by both parties as well as the Court, during trial and after.

Accordingly, I will award the Trust costs in the amount of $507,441.55, the sum remaining after deducting $438,288.94 and $21,056.29 from $966,786.78.

### B. *Experts*

■ The Trust paid $712,594.74 directly to actuarial and accounting experts. Without doubt the work of these experts was critical. Under well established principles of law, however, these expenses are not recoverable, except to the extent of the $40 per day statutory fee and travel expenses for witnesses in general. *See* 28 U.S.C. § 1821(b) (limiting witness fees to $40 per day). A prevailing party may not recover expert witness fees, even where a statute permits the recovery of attorneys' fees, unless the statute explicitly provides for the recovery of expert witness fees. Fed. R.Civ.P. 54(d)(1); *West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 86–87, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (expert fees in civil rights litigation could not be shifted to losing party even though civil

rights statute permitted award of "reasonable attorney's fee," in absence of provision expressly shifting expert witness fees); *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) (Rule 54(d)(1) does not permit taxation of costs for expert witnesses in excess of statutory amounts provided in 28 U.S.C. § 1821(b)); *see also* Local Civ. R. 54.1(c)(3) ("Fees for expert witnesses are taxable only to the extent of fees for ordinary witnesses unless prior court approval was obtained.").

■ I awarded the Trust attorneys' fees and costs pursuant to section 502(g) of ERISA, 29 U.S.C. § 1132(g). *See* 122 F.Supp.2d at 465. As the cases have uniformly held, because section 502(g) does not explicitly permit the recovery of expert witness fees, expert witness fees are not allowable in these types of cases. *See, e.g., Agredano v. Mut. of Omaha Co.*, 75 F.3d 541, 544 (9th Cir.1996) (affirming disallowance of expert witness fees under § 1132(g)); *Emmenegger v. Bull Moose Tube Co.*, 33 F.Supp.2d 1127, 1135–36 (E.D.Mo.1998) (disallowing expert witness fees and expenses under § 1132(g)); *Garlock v. Nelson*, No. 96–1096, 1998 WL 315089, at *1 (N.D.N.Y. June 9, 1998) ("ERISA does not specifically permit fee-shifting for expert witness fees, and therefore the limitations in 28 U.S.C. § 1821 are applicable."); *O'Bryhim v. Reliance Standard Life Ins. Co.*, 997 F.Supp. 728, 737 (E.D.Va.1998) (expert witness fees, absent explicit statutory or contractual authority, not taxable as costs in ERISA case in amounts exceeding $40 per day).

Accordingly, the request for expert witness fees is denied, except that the Trust is awarded expert witness fees and expenses limited to $40 per day for each any expert witness testified at a deposition or at trial (including any additional travel days), together with corresponding travel

expenses to the extent permitted by 28 U.S.C. § 1821.

### 7. Interest on Fees and Costs

██ Hancock also objects to the assessment of prejudgment interest on any award of attorneys' fees and costs. The objection is overruled.

Typically, when a court awards attorneys' fees under a fee-shifting statute, the court uses current hourly rates, even though some of the legal services were provided at some point in the past, to account for the delay in payment. As the Supreme Court has explained in the civil rights context:

> Our cases have repeatedly stressed that attorney's fees awarded under [42 U.S.C. § 1988] are to be based on market rates for the services rendered .... Clearly, compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings. We agree, therefore, that an appropriate adjustment for delay in payment—whether by the application of current rather than historic rates or otherwise—is within the contemplation of the statutes.

*Missouri v. Jenkins*, 491 U.S. 274, 283–84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (citations and footnote omitted). The same reasoning applies in ERISA cases. Here, AKO was paid as its legal services were performed, but the Trust was deprived of the use of that money for all these years because of Hancock's breach of its fiduciary duties. Hence, an "appropriate adjustment" must be made. Because AKO's bills were paid, the appropriate adjustment is an award of interest rather than a recalculation of the fees at current rates.[5]

Prejudgment interest on the award of attorneys' fees and costs will be assessed at the Sperry Trust rate of return, running from December 31 of the year the invoice was issued and paid by the Trust. (*See* Pl. Reply to Def. Obj. at 26; 1/16/01 Supp. Annin Aff. ¶ 4).

### 8. Equitable Relief

In the Opinion, I ordered the removal of Hancock as a fiduciary for the Plan. In its original proposed judgment, the Trust offered a proposal to implement this relief. Hancock objected, and the Trust has offered a modified proposal. (*See* Pl. Reply to Def. Obj. at 27–30). Hancock objects to the modified proposal.

Hancock's objections are overruled, except to the following extent: (1) instead of the 1983 Group Annuitant Mortality table, Hancock may use a current commonly-accepted mortality table; and (2) instead of the table from the actuarial valuations of the Sperry Plan made by Buck in the 1980's, Hancock may use a more current table covering just employees entitled to benefits under GAC 50, if such a table exists or can be promptly created.

Accordingly, the Trust's modified proposal is accepted, except that it is to be further modified to reflect the above rulings.

### CONCLUSION

The Trust's motion for an order modifying the Court's findings of fact is granted to the extent set forth above. Hancock's

---

5. Of course, AKO's current rates are substantially higher than they were back in the mid-1980's when this lawsuit was started. Mr. Kill was billing then at $210 an hour; his current rate is $500 an hour. (12/13/00 Kill Aff., Ex. A).

motion for an order modifying the Court's findings of fact is granted to the extent set forth above and is otherwise denied. Hancock's objections are sustained in part and overruled in part, as set forth above.

The Trust shall submit a final proposed judgment reflecting the above rulings and including revised interest calculations, on or before Monday, April 9, 2001.

SO ORDERED.